IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN DOE,

      Plaintiff,

     v.

THE OHIO STATE UNIVERSITY, et al.,

      Defendants.

Case No. 2:15-cv-2830
JUDGE GREGORY L. FROST
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings: a motion for a temporary restraining order and preliminary injunction (ECF No. 2) filed by Plaintiff, John Doe; and a memorandum in opposition (ECF No. 7) filed by Defendants The Ohio State University, Javaune Adams-Gaston, and Matthew Page ("the OSU Defendants"). For the reasons that follow, the Court **DENIES** the motion for a temporary restraining order. (ECF No. 2.)

### I.  Background

John Doe is a former medical school student at The Ohio State University who was enrolled in a joint M.D./M.B.A. program.[1] He was scheduled to graduate in Spring 2016, but in July 2015, John Doe came before the school's Conduct Board to answer an allegation that he had engaged in sexual misconduct with a medical student, Jane Roe, based on a failure to obtain her consent.[2]

The university's Code of Student Conduct defines "sexual misconduct" as "[p]hysical contact or other non-physical contact of a sexual nature in the absence of clear, knowing and

---

[1] The Court previously ordered that the parties should refer to Plaintiff as "John Doe." (ECF No. 17.)
[2] The Court previously entered an oral order that the parties should refer to the alleged victim as "Jane Roe."

voluntary consent." (ECF No. 1, at Page ID # 40.) The university's written policy on Sexual Misconduct, Sexual Harassment, and Relationship Violence in turn provides that "[s]exual misconduct is conduct of a sexual nature that is nonconsensual, or has the effect of threatening, intimidating, or coercing a person." (*Id.* at Page ID # 53.) The Code of Student Conduct also defines "consent":

> For purposes of this rule, consent shall be defined as the act of knowingly and affirmatively agreeing to engage in a sexual activity. Consent must be voluntary. And individual cannot consent who is substantially impaired by any drug or intoxicant; or who has been compelled by force, threat of force, or deception; or who is unaware that the act is being committed; or whose ability to consent is impaired because of a mental or physical condition; or who is coerced by supervisory or disciplinary authority. Consent may be withdrawn at any time. Prior sexual activity or relationship does not, in and of itself, constitute consent.

(*Id.* at Page ID # 41.) Similarly, the Sexual Misconduct, Sexual Harassment, and Relationship Violence policy provides that consent means "[p]ermission that is clear, knowing, voluntary, and expressed prior to engaging in and during an act." (*Id.* at Page ID # 55.)

The events that led to the sexual misconduct allegation need only be presented in summary form here, given that the focus of today's decision is on whether John Doe is entitled to a temporary restraining order and not on whether the allegation against him is true. There are numerous omitted details that arguably favor each individual's version of the events, but both John Doe and Jane Doe appear to agree on at least what happened at the beginning: In July 2014, Jane Roe accompanied several girlfriends on a night out to celebrate the birthday of one of the women. During the course of the night, Jane Roe consumed a number of alcoholic beverages both before and after she met John Doe at a local bar.

According to Jane Roe, she "blacked out" and has no memory from the time she left the bar with John Doe until she woke up the next morning naked in his bed.

According to John Doe, Jane Roe engaged in public kissing and touching with him while at the bar, they openly discussed sexual preferences, and she agreed to accompany him to his apartment. They left the bar together, with Jane Roe walking without assistance. At the apartment, John Doe and Jane Roe went to his bedroom, where she performed oral sex on him. They then discussed using a condom and whether they were each devoid of sexually transmitted diseases before engaging in intercourse. John Doe asserts that all of this was expressly consensual and that, although she had been "tipsy" earlier in the evening, Jane Roe had the capacity to consent. He also asserts that Jane Roe told him that she had enjoyed the night with him, but that they agreed to keep what had happened between them because they shared mutual friends at the university.

The account of what happened next does not significantly differ, although the why behind what happened does. Both John Doe and Jane Roe agree that she spent the remainder of the night and that upon waking in the morning, they cuddled and kissed. When Jane Roe declined to have intercourse again, they did not do so, and she wore some of John Doe's clothes home. There was subsequent contact between John Doe and Jane Roe, ranging from a meeting or a date, depending on whose characterization is credited, exchanges of text messages, and the like. John Doe characterizes these events as indicative of a potential relationship that fizzled, while arguing that Jane Roe's conduct was inconsistent with the behavior of a victim of sexual misconduct. Jane Roe in turn characterizes these events as her coping attempts at establishing some degree of control and normalcy in a situation in which she did not know how to act.

In March 2015, Jane Roe appeared before The Ohio State University College of Medicine Academic Review Board because she had failed classes in Fall 2014. During that appearance, Jane Roe stated that she had been the victim of sexual assault and that it had affected her

3

academic performance. This statement led to Jane Roe filing a Title IX complaint against John Doe in May 2015, and the university began an investigation into whether John Doe had violated the school's Code of Student Conduct and Sexual Misconduct Policy. The investigation led to a July 15, 2015 hearing in which John Doe had to appear before the school's Conduct Board. Both he and Jane Roe testified, in addition the presentation of opening and closing statements and character evidence.

Following the conduct board hearing, the school expelled John Doe based on a finding that he had engaged in sexual misconduct. He appealed, and after Vice President for Student Life Javaune Adams-Gaston upheld his expulsion, John Doe filed the instant action on September 15, 2015. In his complaint, John Doe asserts the following claims: declaratory judgment that the OSU Defendants violated his due process rights (Count I); violation of 42 U.S.C. § 1983 (Count II); declaratory judgment that the OSU Defendants violated Title IX, 2o U.S.C. § 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106 (Count III); violation of Title IX (Count IV); and injunctive relief (Count V).[3] In conjunction with the filing of his complaint, John Doe also filed a combined motion for a temporary restraining order and a preliminary injunction. (ECF No. 2.) The parties completed briefing on the motion for a

---

[3] The Court expresses no opinion here as to whether John Doe has incorrectly plead redundant claims or a form of relief as a separate claim. *See Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 899 (N.D. Ohio 2010) ("it is axiomatic that [plaintiff] cannot assert two separate counts alleging the exact same claims"); *Goryoka v. Quicken Loan, Inc.*, 519 F. App'x 926, 929 (6th Cir. 2013) (recognizing that a request for injunctive relief is a remedy and not a separate cause of action).

temporary restraining order, and following a September 17, 2015 oral hearing, the motion is now ripe for disposition.[4]

## II.  Discussion

### A. Standard Involved

John Doe seeks a temporary restraining order to reinstate him as a student in good standing, which would enable him to pursue being "matched" with a medical residency. In deciding whether to issue such an order, this Court must consider the following factors: (1) whether he has shown a strong or substantial likelihood of success on the merits; (2) whether he has demonstrated irreparable injury; (3) whether issuance of injunctive relief would cause substantial harm to others; and (4) whether the public interest is served by the issuance of an injunction. *See Rock & Roll Hall of Fame v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). All four factors need not be met; rather, they are to be considered in balance. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Although the four factors must be balanced, the first factor—likelihood of success on the merits—is traditionally of the greatest importance. *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978).

### B. Analysis

John Doe pursues a temporary restraining order based only on his due process claims. The Sixth Circuit has explained that "[t]he Due Process Clause of the Fourteenth Amendment prohibits States from depriving 'any person of life, liberty, or property, without due process of law.' " *Jaber v. Wayne State Univ. Bd. of Governors*, 487 F. App'x 995, 996 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1). To establish a due process claim, John Doe must show

---

[4] The Court held disposition of the motion for a temporary restraining order in abeyance while the OSU Defendants had the conduct board hearing transcribed so that a copy of the transcript could be filed under seal and be part of this Court's consideration.

that the OSU Defendants (1) deprived him (2) of a protected interest (3) without adequate process, which means notice and an opportunity to be heard. *See Goss v. Lopez*, 419 U.S. 565, 579; *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010).

The court of appeals has further explained the general contours of an inquiry into a due process claim such as is presented here:

> In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions. . . . "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). . . .
>
> [T]here are two basic due process requirements: (1) notice, and (2) an opportunity to be heard. . . .

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633-34 (6th Cir. 2005). The "opportunity to be heard" prong means that a disciplinary "hearing, whether formal, informal, live or not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.' " *Id.* at 635 (quoting *Gorman v. Univ. of R.I.*, 837 F.2d 7, 13 (1st Cir. 1988)). What constitutes "meaningful" is partially dependent on context, as the court of appeals has recognized in stating that

> [a]n accused individual has the right to respond and defend, which will generally include the opportunity to make a statement and present evidence. It may also include the right to call exculpatory witnesses. Some circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases.

*Id.* at 636. Cognizant of this basic analytic framework, the Court shall turn to whether John Doe has demonstrated a likelihood of success on each allegation of how the OSU Defendants deprived him of a meaningful opportunity to defend himself.

      *1.*     *Likelihood of Success*

For purposes of today's decision, the Court shall treat the due process counts of John Doe's complaint as essentially one claim, given their overlapping nature. The parties' positions on the merits of the due process claim is essentially straightforward. John Doe asserts that the university failed to conduct a proper investigation, failed to afford him a meaningful opportunity to defend himself, and failed to provide anything other than a kangaroo court that would arrive only at a decision adverse to him. His issues with the process he was afforded fall into several categories, each of which the Court will address briefly below. The OSU Defendants in turn contend that they afforded John Doe all process to which he is entitled and that the conduct board panel was fair and impartial in arriving at the decision it reached.

John Doe first asserts that the university prohibited him from asking Jane Roe about any academic accommodations she received as a victim of sexual misconduct. This is important, John Doe explains, because the university can provide sexual misconduct victims academic accommodations that would permit Jane Roe to repeat the classes she failed. In other words, having already failed courses previously and facing the end of her medical schooling, Jane Roe might have lied about the alleged sexual misconduct in order to salvage her schooling and potential career.

The record indicates that at least one member of the conduct board also considered it important whether Jane Roe had a motivation to lie. In connection with John Doe's closing statement, the following exchange took place:

> BOARD MEMBER: I'm not absolutely sure if you addressed this in your statement. But there seems to be no motivation for [Jane Roe] to make this up. Why do you think she claims she doesn't remember what happened?
> UNIDENTIFIED FEMALE SPEAKER: They can't hear.
> UNIDENTIFIED FEMALE SPEAKER: Can we just make sure everyone speaks up because we can't hear?
> [HEARING COORDINATOR]: Yeah, can you repeat that, [Board Member]?

7

>    BOARD MEMBER:  Why do you think [Jane Roe] should say – she would say she didn't remember anything from that night?  What would be her motivation?
>    [JOHN DOE]:  I can't speak for [Jane Roe].
>    UNIDENTIFIED FEMALE SPEAKER:  He asked the question why – what's the motivation for [Jane Roe] maybe making this up in his opinion.  And he said he couldn't speak for you.
>    UNIDENTIFIED SPEAKER:  (Indiscernible).
>    UNIDENTIFIED SPEAKER:  Asked what's her opinion.
>    [JOHN DOE]:  I'm sorry.  Did you ask a question?
>    UNIDENTIFIED FEMALE SPEAKER:  No.

(ECF No. 15, at Page ID # 258.)  Two comments are warranted regarding this exchange.

First, perhaps the university should buy better sound and recording equipment, not only so that a court could have a transcript devoid of cluttered statements of confusion, but also so that panel members and witnesses could actually hear what is being said.

Second, this exchange presents the crux of the issue of whether the university afforded John Doe sufficient process—as well as the problem facing this Court today: it is unclear what *"I can't speak for [Jane Roe]"* means.  If John Doe meant that he could not offer a motivation for Jane Roe to lie *because he did not know of one*, then it is most likely not the school's fault.  But if John Doe meant that he could not tell the panel why Jane Roe would lie *because the university prohibited him from doing so*, then this Court might have a problem with the hearing.

This is because Sixth Circuit precedent suggests that a denial of the opportunity to explore Jane Roe's motivations may be problematic for the OSU Defendants.  The court of appeals has explained that an accused does not have a constitutional right to cross-examine his accuser in a school disciplinary proceeding.  *Flaim*, 418 F.3d at 641.  But the court of appeals has also noted that in cases that turn on an issue of credibility, cross-examination of witnesses might be necessary for a fair hearing.  *Id.*  Thus, when a panel is confronted with a choice of whom to believe between the accuser and the accused, "cross-examination is not only beneficial,

8

but essential to due process." *Id.* What this means is that there could be a constitutional issue if the university did not permit John Doe to ask the hearing coordinator to inquire into Jane Roe's possible motivation to lie.

Tracking this analysis, John Doe has argued in his briefing and at the oral hearing that the university would not let him present the issue of academic accommodation to the panel. But he has offered no evidence at this juncture to support that his effort to do so was shut down by school action. There is no testimony from John Doe on this matter. There is no transcript reflecting a prohibition on the topic. And there is no paperwork trail before this Court evincing that the university imposed the blanket preclusion that John Doe insists occurred.

Absent such evidence, the Court can only conclude that John Doe has failed to meet his burden of providing a substantial likelihood of success on this issue. This is of course not to say that the issue is settled because the subsequent introduction of such evidence may or may not alter this Court's view. In fact, the Court has grave concerns if the university imposed a prohibitive limitation that prevented John Doe from presenting evidence on a topic and the university's panel then relied on that lack of evidence in making a credibility determination that was wholly or even partially dispositive of the outcome of the disciplinary proceedings. When this Court asked counsel for the OSU Defendants at the September 17, 2015 oral argument about what the panel knew concerning Jan Roe's academic issues, counsel responded only that the panel was aware that she had experienced academic difficulties. This is not necessarily the same thing as saying that the panel knew that sexual misconduct victim status did or might rescue a failing academic career.

This same problem of a lack of a record plagues John Doe's complaints about three other categories of allegedly excluded evidence. John Doe asserts that he wanted to inquire into Jane

9

Roe's claims of prior depression and anxiety, but that the panel did not allow this. He also asserts that the panel did not allow him to inquire as to Jane Roe's prescription drug use on the evening involved. Finally, John Doe asserts that the panel did not allow him to present expert testimony that Jane Roe simply could not have been so impaired so as to lack the capacity to provide consent given the amount of alcohol she purportedly consumed and her age and build.

Similar to the motivation issue, there is no testimony from John Doe on this matter in regard to these three additional alleged prohibitions. There is no transcript reflecting prohibitions on these topics. And there is no paperwork trail before this Court indicating that the university imposed such prohibitions.

One caveat exists to this dearth of evidence. The OSU Defendants indicated at oral argument that experts are not allowed to participate in a disciplinary hearing because of the burdens they would place on the process. The OSU Defendants suggested that it would add additional time to the hearing, perhaps an hour or even more, to this Court's recollection. This appears not to violate the Code of Student Conduct rules, which provide that an accused may submit a written statement, present relevant fact witnesses, and present written statements from character witnesses. (ECF No. 1, at Page ID # 45.) The rules also provide that "[i]n cases requiring special expertise, the board coordinator may appoint individuals with appropriate expertise to serve as consultants to the board. The consultants may be present and provide information as called upon during the hearing but will not vote." (*Id.*) This latter provision appears to open the door to experts at the board's discretion, although there is no evidence before the Court of how this provision is interpreted or implemented by the university.

Setting aside here whether an hour more is really a burden when the academic future and careers of one or more students is at issue, the Court recognizes that the conduct board hearing

10

transcript indicates that the OSU Defendants were correct in representing that John Doe was permitted to summarize his expert's conclusions in his closing statement. This Court is also cognizant of the argument that a summary by an accused may hardly be as persuasive as testimony by a presumably unbiased expert. Standing alone, however, a refusal by the university to hear from the expert does not rise to the level of a constitutional violation sufficient to entitle John Doe to a temporary restraining order.

In summary, John Doe has presented this Court with multiple allegations of how the OSU defendants denied him due process. But he needs not only to *tell* this Court of these purported violations, but also to *show* the Court that they occurred. The conclusory affidavits he offers from an attorney who advised him at the conduct board hearing and an investigator who reviewed the proceedings do not meet this standard. Accordingly, in the absence of evidence of a constitutional violation, the Court can only conclude that John Doe has failed to demonstrate a substantial likelihood of success on the merits to weigh in favor of his request for a temporary restraining order. Having reached this conclusion, the Court need not and does not address the OSU Defendants' alternative qualified immunity argument.

### 2. *Irreparable Injury, Substantial Harm to Others, & Public Interest*

In light of this Court's discussion of the likelihood of success on the merits factor, the Court need not and does not discuss the remaining factors that govern issuance of a temporary restraining order. A district court is not required to make specific findings concerning each of the four factors used in determining a motion for injunctive relief if fewer factors are dispositive of the issue. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

### III. Conclusion

The Court **DENIES** the motion for a temporary restraining order.  (ECF No. 2.)

**IT IS SO ORDERED.**

       /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE