IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


John Doe,                          :

       Plaintiff,

    v.                             :       Case No. 2:15-cv-2830

                                     JUDGE GREGORY L. FROST

The Ohio State University,    :       Magistrate Judge Kemp
et al.,

       Defendants.             :


## REPORT AND RECOMMENDATION

Plaintiff John Doe (not, of course, his real name) enrolled in the Ohio State University College of Medicine in 2011. Sometime after that, he decided to pursue a joint degree program which included an MBA from the Fisher School of Business.  He was scheduled to graduate with both degrees in 2016.

In July, 2014, John Doe and another OSU student, referred to here as Jane Roe, were involved in a sexual encounter.  There is a dispute about the extent to which, if at all, it was consensual; that dispute cannot be resolved here.  However, disciplinary proceedings arising out of this incident resulted in John Doe's dismissal from the University.  He filed this case asking the Court to hold that his federal due process rights were violated during the course of those proceedings.  As part of the relief which he has requested, he has asked for a preliminary injunction reinstating him as a student in good standing.  The motion has been referred to the Magistrate Judge for the holding of a hearing and the issuance of a report and recommendation. The hearing was held on February 16 and 17, 2016.  For the following reasons, the Court recommends that the motion for preliminary injunctive relief be denied.

I.  <u>Factual Background</u>

Because the timeline of events leading up to his ultimate dismissal makes up a substantial part of Plaintiff's case, it will be recited in some detail.  First, though, some background about Jane Roe's academic background is helpful to place some of the later events into context.

Jane Roe began her medical education at The Ohio State University College of Medicine in 2013.  By December of that year, she had asked Dr. Joanne Lynn, Associate Dean of Student Life, for permission to take a leave of absence and to restart the first year of medical school in August, 2014.  As she stated in a later document (Ex. 6, p. 897), she did so due to "academic and personal challenges" including difficulty adapting to medical school education and the death of a close family member.  That request was referred to the Academic and Behavioral Review Committee (ABRC), which decided to grant her request.  In a letter to Ms. Roe dated January 17, 2014 (Ex. 6, p. 850) the ABRC conditioned that grant on her completing summer preparation courses, continuing counseling at the Younkin Success Center, continuing with her study group, and maintaining regular tutoring and academic counseling.  She was told that failure would lead to "referral to ABRC for consideration of dismissal."

Ms. Roe began her first year again as scheduled in August, 2014, one month after her encounter with John Doe.  She did not, upon her return to school, tell any University official that she believed she had been the victim of sexual abuse at the hands of John Doe during the preceding month.  She continued to struggle academically, failing to pass the "Foundations 1" exam until the third try.  She failed another examination as well, and on March 23, 2015, Dr. Danforth, her Academic Program Director, wrote her a letter (Ex. 6, p. 853) advising her that due to her receipt of

an "Unsatisfactory" for "LSI Part One," he was referring her to
the ABRC with the recommendation that the Committee "consider
dismissal from the College of Medicine."

Two days later - March 25, 2015 - Ms. Roe first told someone
connected with Ohio State that she had been the victim of a
sexual assault.  She did so by contacting the Ohio State
University Counseling and Consultation Service for what was
described as a "triage phone screening appointment."  Ex. 6, p.
908.  She did not actually see a counselor that day.  One day
later - March 26, 2015 - the ABRC, through its chair, Dr.
McIlroy, scheduled her hearing for April 15, 2015.  The subjects
of the hearing included "recommendations regarding your
continuation in the College [of Medicine]."  Id., p. 848.

Ms. Roe's first meeting with a counselor occurred on March
31, 2015.  After that, she was scheduled for ongoing treatment.
She was also referred to the Student Life Advocacy Center and met
with an advocate, Natalie Spiert, on April 2, 2015.  Ms. Roe told
Ms. Spiert about the upcoming meeting with the ABRC as well as
about the sexual assault.

Over the course of the next two weeks, Ms. Roe prepared a
statement to be presented to the ABRC.  A copy of that statement
appears in Ex. 6 at pp. 897-902.  After describing the events
which led to her earlier leave of absence, Ms. Roe explained in
her statement that she had been sexually assaulted in July, 2014,
had struggled with her coursework, had contracted a serious upper
respiratory infection, and, in January, 2015, had become
depressed and isolated due to thinking about the assault.  She
outlined the steps she had taken since that time to make others
aware of the assault and to seek treatment and support, and said
that she was "working with the school administration to complete
the sexual assault reporting process, to make sure some good
comes from what happened."  Id. at 901.  She also presented

letters written by Natalie Spiert and Kellie Brennan, Ohio
State's Title IX Compliance Coordinator, in support of her
request to avoid dismissal from the College of Medicine. Ms.
Spiert's letter affirmatively stated that Ms. Roe was "a victim
of a crime sexual in nature," and Ms. Brennan's letter said,
among other things, that Ms. Roe was working with the Title IX
office "to report a sexual assault that occurred in July 2014
...." Id. at 903, 907. A number of other letters from faculty
members were presented as well. On April 21, 2015, the ABRC
officially granted Ms. Roe's request to continue in the College
of Medicine, noting that its decision was based, at least in part
if not entirely, on an "acknowledgment of the apparent impact of
the personal incident [i.e. the sexual assault] which you
described as affecting your performance ...." Id. at 859-60.
Ms. Roe actually learned of the ABRC's decision on April 20,
2015, through a phone call, and Ms. Spiert became aware of it at
about the same time.

Three days before (that is, on April 17, 2015), Ms. Roe made
an appointment to meet with Jeff Majarian, who is an assistant
director in OSU's Office of Student Conduct. His job duties
include investigating complaints of non-academic student
misconduct and making a determination, based on his
investigation, about whether there is "reasonable cause to
believe" that the University's Code of Student Conduct "might
have been violated." Ms. Roe, accompanied by Ms. Spiert, met
with Mr. Majarian on April 30, 2015. She first asked him some
questions about what the process would be if she made a formal
complaint of misconduct. After he answered those questions for
her, she elected to make a formal complaint and, for the first
time, informed a University representative of the name of the
alleged perpetrator.

Mr. Majarian testified in some detail about the

-4-

investigative process.  First, he met with Ms. Roe and took her statement.  He then contacted Mr. Doe to inform him that he was the subject of a misconduct investigation.  Both Ms. Roe and Mr. Doe gave Mr. Majarian the names of witnesses whom they believed had relevant information.  He contacted and took statements from those witnesses.  He did no other investigation and did not request a copy of Ms. Roe's academic records, although he knew that it was common for victims of sexual misconduct to receive some type of academic accommodations.  He also did not re-interview either Ms. Roe or Mr. Doe after talking to the witnesses.  After he completed his investigation, he made a finding of "reasonable cause" on three separate violations of the Code of Conduct and the matter then proceeded to the next step of the student disciplinary process.

The next stage of the process involves a hearing coordinator.  In this case, that was Matthew Page.  Mr. Page's duties included putting together a hearing packet for the panel that was selected to decide whether John Doe was "responsible" or "not responsible" for the alleged misconduct.  That panel of five members was drawn from a larger group of University faculty and staff who had been trained to act as members of a hearing board; here, it consisted of three men and two women.  Two were members of the faculty, and three were staff members.

Some, but not all, of the training materials used to train hearing panel members are found in the record as Exhibit 3.  Many of those documents were intended, according to Kellie Brennan, to educate the panel members about sexual assaults on campus.  They include statements like a "[v]ictim centered approach can lead to safer campus communities"; "[s]ex offenders are overwhelmingly white males"; "[i]n a large study of college men, 8.8% admitted rape or attempted rape"; "[s]ex offenders are experts in rationalizing their behavior"; and "22-57% of college men report

perpetrating a form of sexually aggressive behavior."

The hearing packet (Ex. 5) consisted primarily of the witness statements and letters from character witnesses, as well as a large number of text messages exchanged between Mr. Doe and Ms. Roe.  It did not include Ms. Roe's academic records, and nothing in the hearing packet revealed the sequence of events which occurred in March and April, 2014, including Ms. Roe's receipt of the letter referring her to the ABRC, the fact that she was facing a real possibility of dismissal from the College of Medicine, the fact that she first disclosed the sexual assault to a University employee only after she received the March 23 letter, and the fact that the ABRC granted her a significant accommodation - permitting her to remain in school even though she failed the first-year curriculum twice - as a direct consequence of her having attributed many of her difficulties to a sexual assault.

During this same time frame, which ran from the date of Mr. Majarian's finding to the date of the hearing (July 15, 2014), John Doe hired an attorney, Fran Ward.  He and Ms. Ward were permitted to review all of the material in the hearing packet prior to the hearing, although they were not allowed to make copies.  As part of his defense strategy, Mr. Doe retained an expert witness.  Because the University's refusal to permit that witness to testify or to make his report a part of the record is a part of Mr. Doe's due process claim, it is necessary to provide some detail about the subject of that report and how it related to the issues in this case.

One of the significant aspects of this case is that Ms. Roe said that she was unable to recall anything about the evening in question beyond a certain point.  She had been with a group of friends (which did not  not initially include Mr. Doe, whom she had known prior to that evening) who were celebrating someone's

-6-

birthday and, by all accounts, drinking fairly heavily.  They were at a restaurant in Columbus when she and Mr. Doe exchanged some text messages and he proposed to meet her.  He did so, and they eventually ended up going back to his house (which he shared with other roommates) and spending the night together.  According to the accounts Ms. Roe gave to Mr. Majarian and the hearing panel, she did not recall meeting up with Mr. Doe or any other of the evening's events after that occurred.  In fact, she remembered nothing that happened between the time she was with her friends at the restaurant and when she awoke the next morning at Mr. Doe's residence.  She suggested to the ABRC that she might have been drugged.  On the other hand, Mr. Doe said that she interacted normally with him, that she gave him no reason to believe that she was inebriated beyond the point of consent, that she consumed little or no alcohol after he met up with her, and that everything which occurred was consensual.

In order to attempt to prove that Ms. Roe was capable of providing rational consent that evening, Mr. Doe retained Dr. Alfred E. Staubus, a professor emeritus at the Ohio State University College of Pharmacy and an expert in pharmacology who has served as an expert witness in many similar cases.  Dr. Staubus took information from the witness statements about the amount of alcohol which Ms. Roe had consumed and calculated her likely blood alcohol level at various times during the evening. Based on his calculations, he concluded that she would not have been too intoxicated to consent to sexual activity at the relevant time.  See Ex. 9

Mr. Doe asked that the report be submitted to the hearing panel and that Dr. Staubus be allowed to sit through the hearing and then, based on more specific information about how much Ms. Roe had to drink, to testify as to his conclusions.  The Code of Student Conduct contains a provision about what types of

-7-

witnesses can testify at a student conduct hearing.  <u>See</u> Ex.1,
Section 3335-23-10(C).  As interpreted by Mr. Page, that
provision allows only fact witnesses and character witnesses to
testify.  Because Dr. Staubus did not fit into either of those
categories, Mr. Page did not incorporate the report into the
hearing packet and did not permit Dr. Staubus to attend the
hearing or to testify.  That decision was not based either on the
lack of relevance of the testimony or the lack of qualifications
of Dr. Staubus to express his opinions.

The hearing took place on July 15, 2015.  It lasted about
three hours.  Both John Doe and Jane Roe attended in person,
although she was in a separate space and appeared via a video
camera link.  She was accompanied by Natalie Spiert.  Testimony
was taken from both of them and from approximately six other
witnesses.  Each was allowed to question the witnesses, and Mr.
Doe was permitted to ask questions of Ms. Roe, although he had to
direct his questions to Mr. Page, the hearing coordinator, who
then repeated or rephrased them to Ms. Roe.  Mr. Doe was
permitted to have his attorney, Ms. Ward, with him in the hearing
room, but she was not permitted to participate in the hearing.
She could, however, whisper to Mr. Doe, write him notes, or ask
for a recess so that she could speak to him.  Mr. Doe was also
permitted to read the concluding paragraphs of Dr. Staubus'
report as part of his closing statement.

Ms. Roe made at least two statements during the course of
the hearing which Mr. Doe claims were untrue.  First, she was
asked by John Doe what her grades had been that year.  She
questioned the relevance of that information.  In response, John
Doe stated that a student had only six years to complete medical
school and if someone had to repeat a year twice, it was grounds
for dismissal.  He explained that he wanted to know if this
incident had affected her grades and, more specifically, if she

had failed her second attempt at completing her first year and would not be able to re-enroll.  Ex. 4, Tr. 208.

Jane Roe's response to this question was that she "had to present this case to the [ABRC] and tell them about this assault and how it affected me throughout this year."  After expressing how hard it had been to do that, she said that "their decision to keep me in school and allow me continue next year in the fall was already decided before my decision to report this assault."  Ex. 4, Tr. 209.  John Doe did not ask any follow-up questions about that subject.

Secondly, Jane Roe said, toward the end of the hearing (Ex. 4, Tr. 300) that she had pursued the matter formally not for any ulterior motive or to obtain any benefit but did so in order that others would not face the same situation, and so that Mr. Doe would realize that what he did was wrong.  She made the specific statement that "this [reporting the assault] doesn't give me any benefit other than holding him responsible and meeting an ethical obligation – or responsibility, rather."

As will be discussed in more detail later, Mr. Doe asserts that the sequence of events recited above, which was not disclosed to either him or to the hearing panel - specifically, the close relationship in time between Jan Roe's receipt of the March 23, 2015 letter from Dr. Danforth and her decision on March 25 to begin contacting various University departments about the assault, culminating in her successful effort to avoid dismissal - would have cast doubt on the truth of these statements.  He contends that this sequence of events suggests that Ms. Roe had a motive to fabricate her allegations in order to avoid being dismissed from the College of Medicine, and that she succeeded in that effort only because she claimed to have been the victim of a sexual assault.

To complete the history of the administrative proceedings,

-9-

the hearing panel found Mr. Doe "responsible" for all three alleged violations and concluded that he should be immediately dismissed from Ohio State.  He appealed to a single appeals officer, Dr. Adams-Gaston.  Mr. Page, the hearing coordinator, prepared a summary of the hearing procedure in response to Mr. Doe's appeal and provided it to Dr. Adams-Gaston, but that summary was not served on Mr. Doe or his attorney.  Seven weeks after the hearing panel made its decision, Dr. Gaston-Adams upheld it.  That action concluded the administrative process, and this lawsuit followed.

In response to being dismissed from Ohio State, John Doe enrolled in another medical school, although it is not located in the United States.  He is completing his final year doing clinical rotations.  The next step in his medical education is a residency.  Decisions about residency will be made by March 14, 2016.  Mr. Doe is concerned that his chances of obtaining a residency have been greatly reduced by virtue of his dismissal from Ohio State.  He provided some testimony - which was clearly hearsay - to the effect that a student in good standing at Ohio State is almost guaranteed to obtain a residency, whereas a student in his situation stands less than a 50% chance of doing so.

## II.  Preliminary Injunction Standard

The legal test for issuing a temporary restraining order is well-known. The decision-making process involves balancing four factors-whether the plaintiff will suffer irreparable injury if relief is not granted, whether the plaintiff has shown a strong or substantial likelihood of success on the merits, and how the grant or denial of relief would affect both public and private interests. See, e.g., Workman v. Bredesen, 486 F.3d 896, 905 (6th Cir. 2007) (describing the factors as "(1) whether the claimant has demonstrated a strong likelihood of success on the merits,

-10-

(2) whether the claimant will suffer irreparable injury in the absence of a stay, (3) whether granting the stay will cause substantial harm to others, and (4) whether the public interest is best served by granting the stay").

"No single factor will be determinative as to the appropriateness of equitable relief ...." Six Clinics Holding Corp., II v. Cafcomp Systems, Inc., 119 F.3d 393, 400 (6th Cir. 1997), citing In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985). Rather, these factors are to be balanced, and "[a] finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at a minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.' " Gaston Drugs, Inc. v. Metropolitan Life Ins. Co., 823 F.2d 984, 988 n. 2 (6th Cir. 1987) (quoting Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir.1982)); see also Frisch's Restaurants v. Elby's Big Boy, 670 F.2d 642, 651 (6th Cir. 1982). Nevertheless, "irreparable injury is generally required to warrant injunctive relief," Kendall Holdings, Ltd. v. Eden Cryogenics LLC, 630 F.Supp.2d 853, 866 (S.D. Ohio 2008), so that if the injury which the plaintiff seeks to prevent is compensable by a monetary damages award, there is usually no basis upon which to grant any type of injunction, no matter how strong a showing of likelihood of success on the merits is made.

### III.  Discussion

#### A.  Likelihood of Success on the Merits

At the close of the hearing, John Doe identified five separate due process violations which, he alleges, rendered his disciplinary procedure unconstitutional.  They are:

(1) The decision to exclude Dr. Staubus' report and

testimony;

(2) The failure by Mr. Majarian to conduct a full investigation;

(3) The failure by multiple Ohio State employees to disclose, either to Mr. Doe or to the hearing panel, the sequence of events which occurred in March and April, 2014, or the full extent of Ms. Roe's academic accommodations;

(4) The bias which the training materials introduced into the members of the hearing panel; and

(5) Permitting Ms. Roe to make two false statements during the course of the hearing.

It is Ohio State's position that, even accepting the version of the facts most favorable to Mr. Doe (and Defendants make this same argument in their motion to dismiss), he has not proved a due process violation.  The resolution of this issue depends on the extent to which the Due Process Clause applies to university student disciplinary proceedings and what rights it confers on students like Mr. Doe who are accused of misconduct and face explusion.

### A.  General Principles

There is no question that "the Due Process Clause is implicated by higher education disciplinary decisions." Flaim v. Medical College of Ohio, 418 F.3d 629, 633 (6th Cir. 2005).  The Flaim court also made clear that "[t]he amount of process due will vary according to the facts of each case and is evaluated largely within the framework laid out by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)" and that in a case involving a disciplinary, rather than an academic, expulsion, the court is to "conduct a more searching inquiry." Id. at 634.  In their pre-hearing brief, Defendants endorse these principles, see Doc. 58 and this Court has applied them to similar student disciplinary cases.  See, e.g., Richards

-12-

v. McDavis, 2013 WL 5297244 (S.D. Ohio Sept. 19, 2013).

Also, it is not disputed that the basics of due process consist of notice of the charges and an opportunity to be heard. See Goss v. Lopez, 419 U.S. 565, 579 (1975). Here, John Doe does not dispute the adequacy of the notice he received; his claims focus on the adequacy of the investigative and hearing processes. As to that claim, the Court's analysis is governed by Mathews v. Eldridge, and it requires consideration of three factors: "(1) the nature of the private interest affected—that is, the seriousness of the charge and potential sanctions, (2) the danger of error and the benefit of additional or alternate procedures, and (3) the public or governmental burden were additional procedures mandated." See Flaim, supra, at 635.

The first factor is, in this type of case, a compelling interest; as one court has put it, facing charges of sexual assault against a fellow student implicates not only a student's interest in not being wrongly expelled from school, but involves "potential consequences [which] reach beyond [the student's] immediate standing at the University" such as the student's good name, reputation, honor, and integrity, opportunities for additional education, and future employment. See Gomes v. Univ. of Maine System, 365 F.Supp.2d 6, 16 (D. Me. 2005), citing Goss, 419 U.S. at 574.

In the context of such a student disciplinary process, Flaim explains that, applying the Mathews factors, the hearing provided must be "meaningful" and, if conducted live, the student must be allowed to be present for all significant proceedings. However, courts have not applied the rules of evidence to those proceedings, have not required that witnesses be sworn, and have not (in most cases) imposed a requirement that the student be allowed to be actively represented by counsel. Some type of record-making procedure is usually required, but an appellate

-13-

process is usually not.  See id. at 636-37.  Finally, the Flaim
court recognized that the Due Process Clause sets a floor, not a
ceiling, for the type of process a university might wish to
provide its students, and that a procedure which is "far from
ideal and might certainly [be] better" may still satisfy the
requirements of due process.  Id. at 637.

B.  John Doe's Specific Claims

1.  Failure to Disclose Jane Roe's Academic Records

The most significant of the alleged due process violations
relates to information which might, had it been disclosed, have
allowed the hearing panel better to assess Ms. Roe's credibility.
That is, of course, the evidence about when Ms. Roe first
reported the incident to anyone with official standing at the
University, and what the ABRC provided to her as an accommodation
(and when and why it did so).  At the preliminary injunction
hearing, counsel for Ohio State suggested, through questioning
and otherwise, that nothing prevented John Doe from asking
questions about the timing and nature of Ms. Roe's reporting of
the incident, or about the extent of the academic accommodations
she received (and when and why she received them) even without
the documents in question.  That suggestion is, at the same time,
both true and not very helpful.

No attorney, when cross-examining a witness, can be expected
to think of and ask all relevant questions without some ability
to identify fruitful areas of cross-examination in advance.  That
is why discovery is available in civil cases, and the rule of
Brady v. Maryland, 373 U.S. 83 (1963) has been interpreted to
require the disclosure of impeachment evidence in criminal cases.
See United States v. Bagley, 473 U.S. 667, 676 (1985).  In each
of those settings, nothing prevents an attorney from asking the
questions which, once the evidence in question is disclosed,
become obvious, but the lack of any foundation for asking them -

-14-

i.e. the undisclosed exculpatory evidence - is still viewed as prejudicial.  That is even more likely to be so in a student disciplinary hearing where it is the student, and not his or her attorney, who is primarily responsible for presenting the defense at the hearing.

The University's failure to provide Mr. Doe with records in its possession which would have assisted him in attacking Ms. Roe's credibility at the hearing can be conceptualized, at least in part, as a failure to provide John Doe with the opportunity to conduct a meaningful cross-examination of Jane Roe at the hearing.  In the typical case, however, the Due Process Clause does not compel a university to allow cross-examination at all. See, e.g., Sterrett v. Cowan, 85 F.Supp.3d 916, 929 (E.D. Mich. 2015)("confronting the Complainant, let alone other witnesses, is not an absolute right and is generally not part of the due process requirement in a school disciplinary setting"); see also Winnick v. Manning, 460 F.2d 545, 549 (2d Cir. 1972) ("[t]he right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings").  The Winnick court also observed that "if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing," id. at 550, but since that case did not involve such a problem, that statement is dictum.  Nevertheless, even if this is one of those cases where cross-examination was essential to a fair hearing, John Doe was afforded the right to confront and to cross-examine each of the witnesses who testified, including Jane Roe.  But given that he may well not have been entitled, on due process grounds, even to question her - as opposed simply to giving the hearing panel his version of events after learning what her version was - it is not likely that this Court will find that he had a constitutional right to effective

-15-

(or, more properly phrased, more effective) cross-examination.

The other conceptual aspect of this claim focuses on the prejudice to Mr. Doe resulting from the failure to turn over potentially valuable and exculpatory impeachment evidence - essentially a Brady claim.  Similar claims have not fared well in other cases.  In Gomes, for example, the court was faced with a case much like this one, where the issue was consent to sexual conduct and the parties' credibility was a crucial factor.  The police had also conducted an investigation and, according to the accused students, the police notes of the complainant's interview contained inconsistent statements which could have placed her credibility in doubt.  The university's investigator had those records but did not provide them either to the accused students or the hearing committee.  That failure (coupled with the fact that the complainant was given access to the records) raised serious due process concerns.  However, the court found that "[t]ight time constraints" and "a general rule against imposing discovery requirements on university disciplinary proceedings," among other factors, precluded finding a due process violation. Gomes, 365 F.Supp.2d at 22.  The second consideration applies here as well.

Even if it is true that, had the entire picture been before them, Mr. Doe would have been better able effectively to challenge Ms. Roe's motivation for bringing forth her allegations of sexual assault, and the hearing panel would have been better able to judge her credibility, that does not mean that all aspects of this evidence were concealed from and unknown to both Mr. Doe and the hearing panel.  Ms. Roe explained in her opening statement that she had taken a leave of absence after her first semester of medical school and, as a result, had restarted her first year of medical school in August, 2014.  Mr. Doe was independently aware of that fact.  Ms. Roe testified without

-16-

contradiction that she told a friend (but not any University official) as early as December, 2014, that she was struggling with an issue involving Mr. Doe, and she related the entire story to that friend in January, 2015, two months before the letter from Dr. Danforth was written. She also testified that at some time during the year she became unable to do school work. At the hearing, she brought up her meeting with the ABRC and revealed the fact that the ABRC had permitted her to remain in school, a decision that Mr. Doe admittedly knew was very unusual. She also made clear that she told that committee about the sexual assault. In her witness statement, Ms. Roe said she was unaware of the official reporting process concerning sexual assault until she spoke with one of the medical school deans about it. Everyone involved in the process was aware of her substantial delay in reporting it; the notes of Ms. Roe's meeting with Mr. Majarian where she first provided details of the assault are in the hearing packet and are dated May 1, 2015, almost ten months after the incident. The point of reciting all of these facts is to show that the impact of the non-disclosed information may not have been as crucial as Mr. Doe contends. Certainly, it would have been useful; it is difficult to describe it as critical. That cuts against the likelihood that Mr. Doe will succeed on the merits of this part of his claim.

## 2. Adequacy of the Investigation

In the Court's view, the inadequate investigation claim is closely tied to the failure to disclose relevant evidence claim. The gist of this complaint is that, had Mr. Majarian done a more thorough job of collecting evidence, he would have found, and included in the hearing packet, the timeline evidence in question. The primary purpose of his investigation, however, was to enable him to decide if the case should proceed beyond the investigatory stage; that is, to help him determine if the

-17-

"reasonable cause to believe" standard was satisfied. There is no evidence that he would have decided that issue differently had he known of the timeline of events which occurred in March and April, 2015, or if he had known of the exact academic accommodation given to Ms. Roe. In any event, Mr. Doe does not argue that his rights were violated by Mr. Majarian's reasonable cause finding, but only by the fact that "a biased investigation [i.e. one lacking the timeline evidence] ... [was] then provided to the trier of fact." Plaintiff's Hearing Brief, Doc. 61, at 8. The Court does not consider this to be an independent claim of a due process violation, and for the reasons set forth above, thinks it unlikely that it will succeed.

3. <u>Failure to Correct False Testimony</u>

Although phrased somewhat differently, the claim that the University (primarily through Natalie Spiert, Ms. Roe's advocate) failed to correct false testimony at the hearing also dovetails into the exculpatory evidence claim. The corrections at issue would have consisted of revealing to the hearing panel that Ms. Roe had, in fact, told University officials about her allegations of sexual assault as part of an effort to avoid dismissal from school, and that those allegations were brought forth prior to the ABRC hearing (and perhaps in response to the imminency of that hearing). Ms. Spiert, however, testified that she did not perceive either of the two statements in question to be false because Ms. Roe never made a formal report of her allegations until after the ABRC made its decision to keep her in school, and because the academic benefit which Ms. Roe obtained stemmed not from reporting the alleged assault to Mr. Majarian, but from explaining the circumstances to the ABRC - something Ms. Roe revealed in her testimony to the hearing panel. Again, Ms. Spiert could perhaps have amplified the testimony or provided a larger context by pointing out that other facts were not

-18-

mentioned as part of these statements, but that is a far cry from intentionally permitting materially false testimony to be presented to a hearing panel. Again, the likelihood of success on this claim is not great.

### 4. Exclusion of Expert Testimony

Turning to the decision to exclude Dr. Staubus' report and testimony, to the extent that Mr. Doe may be suggesting that this exclusion is, in and of itself, a due process violation, he has cited no cases which so hold. Nor do the cases above suggest that the opportunity to provide expert testimony is a necessary due process protection in a university disciplinary proceeding. Mr. Doe's argument is more appropriately characterized as one that, because he was not permitted to present expert testimony to refute Ms. Roe's claim of inability to consent, his due process right to defend himself against the charges was violated. This right, as recognized by courts, "generally include[s] the opportunity to make a statement and present evidence" and "may also include the right to call exculpatory witnesses." Flaim, 418 F.3d at 636.

Mr. Doe retained Dr. Staubus to provide evidence that Ms. Roe was capable of providing rational consent. That was certainly the key issue at the disciplinary hearing. But Mr. Doe was not prevented from offering other evidence on that issue, and he did so. For example, he testified that, when he and Ms. Roe met up that night, she was behaving normally. He further testified that, after he joined her, she consumed little or no alcohol. One of his witnesses testified that when he saw Mr. Roe sitting on the couch with Mr. Doe about 1:30 in the morning, he carried on a very brief but normal conversation with her. Beyond this, Mr. Doe was permitted to read Dr. Staubus' conclusions as part of his closing statement. Given these circumstances, the impact of excluding Dr. Staubus' report was incremental, and did

-19-

not prevent Mr. Doe from defending himself on the central issue
of Ms. Roe's ability to consent.  In a different case where the
central issue is one which could only be understood or addressed
through expert testimony, the due process calculus might produce
a different result, but it does not do so here.  Again, keeping
in mind that a student disciplinary proceeding and not a trial is
involved in this case, it is unlikely that Mr. Doe will succeed
on the merits of this claim.

5.  <u>Hearing Panel Bias</u>

Finally, as to the claim of bias on the part of the members
of the hearing panel, the applicable legal standards are well-
explained by this language from <u>Furey v. Temple University</u>, 884
F.Supp.2d 223, 255 (E.D. Pa. 2012):

> An impartial and unbiased adjudicator is a fundamental
> part of due process. [internal citations omitted]. In
> disciplinary hearings, there is a presumption of
> impartiality in favor of the school administrators. The
> plaintiff bears the burden of rebutting this
> presumption with sufficient evidence. <u>Gorman [v.
> University of Rhode Island]</u>, 837 F.2d [7 (1st Cir.
> 1988)], at 15. Allegations of "prejudice of university
> hearing bodies must be based on more than mere
> speculation and tenuous inferences." <u>Id</u>. (quoting <u>Duke
> v. N. Texas State Univ.</u>, 469 F.2d 829, 834 (5th
> Cir.1972)).

There is undeniably some evidence in this case from which it
could be inferred that the training materials used to train these
panel members are biased against males who are accused of sexual
misconduct.  Counsel for Mr. Doe made the point that a jury would
never be permitted to hear the type of statements contained in
those materials because, in their effort to dispel what are
perceived as common stereotypes or myths about campus sexual
assaults, they seem to provide replacement stereotypes - for
example, that someone who comes across as honest and

-20-

straightforward may well be a sexual predator who has learned how to disguise his true nature, or that statistically a large percentage of college-age males commit sexual crimes.

On the other hand, there is no evidence in this record as to what the balance of the training consisted of.  Kellie Brennan testified that there is additional information provided about due process and about how to conduct a fair and impartial hearing. Context matters.  At this stage of the case, the Court's inquiry is limited to determining whether, given that the sole evidence of bias is the power point slides which make up Exhibit 3, it is likely that Mr. Doe will prevail on his claim of bias.  That does not appear to be the case.

### 6.  Conclusion

As another court has said about the type of procedure involved in this case,

> neither a full-scale adversarial proceeding similar to those afforded criminal defendants, nor an investigation, which would withstand such a proceeding, is required to meet due process. A university's primary purpose is to educate students; "[a] school is an academic institution, not a courtroom or administrative hearing room." [footnote omitted] A formalized hearing process would divert both resources and attention from a university's main calling, that is education.[footnote omitted] Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms.

Murakowski v. Univ. of Delaware, 575 F.Supp.2d 571, 585-86 (D. Del. 2008).  When a university provides a student facing disciplinary proceedings with a full hearing, advance notice of the charges and the evidence, and the opportunity to call witnesses and to confront the accuser, it is extremely difficult for that student to prove a due process violation.  That appears to describe this case.  The Court concludes, for all of these

-21-

reasons, that John Doe has not demonstrated that he is likely to succeed on the merits of his due process claim.

C.  Irreparable Injury

As noted above, there are cases where a relatively weak showing that a plaintiff is likely to succeed on the merits can be counterbalanced by a strong showing of irreparable injury. That, too, is not this case.

This Court has previously canvassed the case law concerning irreparable injury arising out of an interruption or suspension of higher education, observing in Sellers v. University of Rio Grande, 838 F.Supp.2d 677, 687 (S.D. Ohio 2012) that

> [t]here is some authority for the proposition that an interruption in an educational program is not, of itself, an irreparable injury. See, e.g. Baer v. National Bd. of Medical Examiners, 392 F.Supp.2d 42, 49 (D. Mass. 2005)(stating, in the context of a medical student's ADA claim, that "her inability to continue as a medical student without interruption at Drexel, while desirable, is not a harm that is irreparable to Baer's potential medical career").  There is contrary case law, however, especially when the denial of an educational opportunity is coupled with other types of harm.  Thus, the court in Maczaczyj v. State of N.Y., 956 F.Supp. 403, 408 (W.D.N.Y. 1997) found the evidence of irreparable harm caused by the refusal of a university to permit a disabled student to pursue a graduate degree to be sufficient to support a preliminary injunction where the exclusion "would most likely affect the plaintiff's ability to engage in the future employment of his choice" and there was also an "unquantifiable effect th[e] exclusion will have on plaintiff's mental illness."  Because the plaintiff was "likely to suffer additional psychic harm," the court found the injury to be irreparable.  Other courts have similarly found even a delay in the ability to pursue a chosen profession to be the type of irreparable harm which will support temporary injunctive relief. See, e.g., Bonnette v. District of Columbia Court of Appeals, 796 F.Supp.2d 164, 186 (D.D.C. 2011)("The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation").

As evidence of an irreparable injury which would flow from his failure to gain reinstatement, Mr. Doe offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing at Ohio State than someone in his situation.  He described the "match" and "scramble" procedures by which medical students are offered residencies, and provided some statistics which purportedly supported his view.

As a matter of common sense, Mr. Doe's claim has some appeal.  But the subject of his testimony is not so well known or accepted that the Court can take judicial notice of it, nor did he ask the Court to do so.  A claim of injury must be based on admissible and reliable evidence, and his is not.  Everything Mr. Doe knows about the residency process came from what someone else has told him.  That type of hearsay evidence is a thin reed upon which to rest a claim of irreparable injury.

There is also some question about whether he will suffer any legally cognizable injury if he is not reinstated to Ohio State prior to March 14, 2016.  He may well obtain a residency.  If he does, it would be, on this record, mere speculation as to whether that residency would be of lesser value to him than any residency he would get if he were able to represent to various residency programs that he was a student in good standing at The Ohio State University College of Medicine.  Even if that were true, there is no evidence in this record about how the difference in the quality of a residency would play out over the course of a career in terms of either positions available or income potential.

Certainly, Mr. Doe's medical education pathway has been disrupted by his dismissal from Ohio State.  But it is far from clear that, absent an injunction at this point, he will be unable to complete his education or to pursue his chosen profession.  Given this state of the record, the risk of irreparable injury is

-23-

not sufficiently strong to outweigh the low probability that he
will succeed on the merits of his constitutional claims.

### D.  <u>The Public and Private Interests</u>

The public and private interests affected by a preliminary
injunction do not appear strongly to favor either party.
Certainly, any plaintiff who has wrongly been expelled from a
university has an interest in reinstatement, and there is a
public interest in vindicating constitutional rights.  On the
other hand, universities have an interest in disciplining
students who have committed serious infractions of university
rules and in protecting other students from the type of conduct
alleged here, and the public has a similar interest.  The conduct
involved in this case does not speak directly to Mr. Doe's
competence as a medical student, so enabling him to get a
residency - if that would be the effect of an injunction - would
not appear to pose a substantial risk of harm to others.
However, Ohio State has represented in a post-hearing brief that
if Mr. Doe were reinstated, he would be required to be on campus
on occasion, which would place him in the same environment as Ms.
Roe.  Mr. Doe suggests, in his post-hearing brief, that the Court
can solve that problem by directing that he have no contact with
her, or she can resort to obtaining a protection order from the
state court, but even with such measures in place, there is some
potential that her interests would be adversely affected by a
preliminary injunction.  On balance, these factors do not favor a
result contrary to the outcome suggested by the first two
factors.

### IV.  <u>Miscellaneous Matters</u>

The Court's disposition of the preliminary injunction motion
renders it largely unnecessary to discuss other issues which the
parties have raised in their various filings.  For example, Ohio
State has argued that even under the <u>Ex Parte Young</u> doctrine (<u>see</u>

-24-

Ex Parte Young, 209 U.S. 123 (1908), Mr. Doe cannot avoid the
application of the Eleventh Amendment as a bar to his claims.
That would not appear to be correct as to the request for
preliminary injunctive relief, because that is relief which is
both prospective in nature and designed to remedy an alleged
violation of Mr. Doe's right to continue with his education at
Ohio State, but the Court need not decide that issue if no
injunction will be granted.

     Similarly, Ohio State argues that it could not have provided
Mr. Doe or his counsel with copies of Jane Roe's academic records
which would show the timeline in question because that would have
violated the Family Educational Rights and Privacy Act (FERPA),
20 U.S.C. §1232g.  It seems to the Court that, at a minimum, the
hearing panel could have been given access to those records, and
perhaps that the records could have been redacted to the extent
that their production would not have violated FERPA but still
provided Mr. Doe with the information he sought, something he
suggests in his post-hearing brief.  Again, resolution of the
preliminary injunction motion in Ohio State's favor moots that
question.

     Finally, the Court had asked counsel at the hearing if any
party objected to shortening the period for objecting to the
Report and Recommendation from fourteen to seven days.  Mr. Doe
consented to that action.  Ohio State has objected based on its
counsel's unavailability for a short period of time later this
month, but since the objection, if any, would likely come from
Mr. Doe, that does not seem to be an obstacle to shortening the
time for objection.  The Court will do so at the conclusion of
this Report and Recommendation.

                    V.   Recommended Disposition
     For all of the reasons set forth above, it is recommended
that the motion for preliminary injunctive relief (Doc. 2) be

                            -25-

denied.

## VI.   <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within **seven** days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a <u>de</u> <u>novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de</u> <u>novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir.1981).


<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge