**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| John Doe, | |
| Plaintiff, | Case No. 2:15-cv-2830 |
| v. | Judge Graham |
| The Ohio State University, et al., | Magistrate Judge Kemp |
| Defendants. | |

## OPINION & ORDER

The Ohio State University ("OSU") expelled one of its students, John Doe[1], for sexual misconduct. A university hearing panel found that Doe engaged in sexual misconduct by having sex with a classmate who lacked the capacity to consent because she was inebriated. John Doe claims OSU expelled him because of a fundamentally unfair disciplinary process. He argues that, among other things, OSU and some of its personnel knew that his accuser had a reason to fabricate her charge of sexual misconduct, but they failed to provide him with this information before the hearing and instead permitted her to make false or misleading statements to the hearing panel. Doe sued OSU and five of its administrators (the "Administrators") alleging they violated his procedural due process rights. Doe alleges claims against two of the Administrators in their official capacity and alleges claims against all five in their individual capacity. Now, OSU and its administrators (collectively, "Defendants") move to dismiss Doe's claims based on Eleventh Amendment immunity and qualified immunity.

## I. Background

### A. Factual allegations

John Doe was a joint degree M.D./M.B.A. student at OSU. (Am. Compl. at ¶ 3, Doc. 44). The woman who accused him of sexual misconduct, Jane Roe[2], is a female medical student at

---

[1] He proceeds anonymously per this Court's order. (Doc. 17).
[2] Judge Frost indicated in his order denying Doe's motion for a preliminary injunction that the Court entered an oral order that the parties should refer to the alleged victim as "Jane Roe." (Doc. 75 at 2 n.2).

OSU. (*Id.* at ¶ 40). OSU is a public university created by the Ohio Legislature. (*Id.* at ¶ 4). The five Administrators each have different roles at OSU.

Defendant Javaune Adams-Gaston is the Vice President for Student Life at OSU. (*Id.* at ¶ 5). Doe alleges that Adams-Gaston is responsible for OSU's Student Code of Conduct and Judicial System and made the ultimate decision to expel Doe from OSU. (*Id.*).

Defendant Matthew Page is the Associate Director for Student Life at OSU. (*Id.* at ¶ 6). Doe alleges Page "has responsibility for helping to enforce and manage the disciplinary hearings" at OSU, and he "is also a Deputy Title IX Coordinator at OSU." (*Id.*).

Defendant Jeff Majarian is an Associate Director for Student Life at OSU. (*Id.* at ¶ 7). Doe alleges Majarian was responsible for the investigation into Jane Roe's allegations that ultimately led to Doe's expulsion. (*Id.*).

Defendant Kellie Brennan is the Title IX Coordinator for OSU. (*Id.* at ¶ 8). Doe alleges that Brennan was responsible for OSU's Title IX compliance, including providing education and training and ensuring the "university responds appropriately, effectively and equitably to Title IX issues." (*Id.*). Doe alleges that Brennan is responsible for "helping alleged victims obtain accommodations from OSU" and must serve "as consultant to any disciplinary hearing panel." (*Id.* at ¶ 27).

Defendant Natalie Spiert is the Sexual Violence Support Coordinator in OSU's Office for Student Life. (*Id.* at ¶ 9). Doe alleges Spiert "provides support and resources for students who have experienced sexual violence" in her capacity as the Sexual Violence Support Coordinator at OSU. (*Id.*). Doe alleges that Spiert knew that Doe's accuser made a false or misleading statement to the hearing panel. (*Id.* at ¶ 67).

The factual background of this case is laid out in great detail in Magistrate Judge Kemp's Report and Recommendation ("R&R"). (*See* Doc. 66 at 2–10). For purposes of this motion, a summary of the factual allegations will suffice.

John Doe was enrolled at OSU in a joint M.D./M.B.A. program. He was set to graduate from the program in May 2016, but OSU expelled him on September 10, 2015. He was expelled following a hearing before OSU's Conduct Board where he responded to an allegation that he had engaged in sexual misconduct with a medical student, Jane Roe. At the hearing, Doe testified that his sexual encounter with Jane Roe was consensual; Jane Roe testified that she had no memory of the encounter. Other witnesses testified about Doe and Roe's characters and the

events of that night, including their perception of Jane Roe being intoxicated. Ultimately, the hearing panel found Doe had violated the OSU Code of Conduct or Sexual Misconduct Policy.

Doe alleges that throughout the investigation, hearing, and appeal process, the Defendants denied him procedural due process in a number of different ways. The basis for many of his due process claims is that OSU denied him the opportunity to present his story: that he and Jane Roe had consensual sex, and she fabricated the no-consent story when she faced failing out of medical school for the second time. Key to John Doe's allegations is a timeline of events.

On July 12, 2014, John Doe and Jane Roe had sex at John Doe's apartment. On March 23, 2015, Jane Roe received a copy of a letter informing her that she was being "referred to the ABRC [Academic Behavioral Review Committee] for consideration of her dismissal from the OSU Medical School." (Am. Compl. at ¶ 47). Dr. Danforth, the chair of the ABRC, made it clear to Jane Roe that "[h]er expectation that she will be permitted to continue in the curriculum is unrealistic." (*Id.*). Doe alleges that on March 25, 2015, for the first time, Jane Roe contacted the Office of Student Life at OSU to report that she was the victim of a sexual assault. (*Id.* at ¶¶ 48–49). Doe met with the ABRC on April 15, 2015. (*Id.* at ¶ 51). On April 17, 2015, Jane Roe scheduled an appointment to meet with Majarian as part of the process of reporting the incident to another university body, the Student Conduct Office. (*Id.* at ¶ 53). On April 21, 2015, the ABRC granted Jane Roe the opportunity to repeat the first year of medical school. (*Id.* at ¶¶ 52, 54).

Doe alleges that the Administrators knew that Jane Roe received this accommodation—the chance to repeat the first year of medical school—and knew that she didn't report the incident until after facing the prospect of failing out of medical school for the second time. OSU failed to turn over this key piece of evidence before Doe's disciplinary hearing. Further still, at the disciplinary hearing, Jane Roe indicated she only reported the sexual misconduct after OSU's decision to allow her to again repeat the first year of medical school. (*Id.* at ¶ 67).

Doe argues he would have been able to use evidence of Roe's accommodation at the hearing to impeach Roe's credibility, to refute her statement that she only reported the incident after the university's decision to allow her to repeat her first year of medical school again, and to answer one of the panel member's questions about Jane Roe's incentive to fabricate her story. Since the outcome of the hearing appeared to turn on a question of credibility, by denying Doe this critical evidence, Doe argues that OSU denied him procedural due process.

### B. Procedural Background

In September 2015, John Doe filed a verified complaint seeking a declaratory judgment, injunctive relief, and damages, arguing that OSU and the Administrators violated his due process rights and Title IX. (Doc. 1). Doe also moved for a Temporary Restraining Order, (Doc. 2), which the Court denied in October 2015, (Doc. 20). After a first motion to dismiss from Defendants, (Doc. 28), Doe filed an amended complaint, (Doc. 44). Shortly thereafter, Defendants filed a motion to dismiss the claims in the amended complaint. (Doc. 55). Later that month, Magistrate Judge Kemp recommended that the motion for preliminary injunction be denied. (Doc. 66). Judge Frost adopted the R&R in April 2016. (Doc. 75). Judge Frost noted, in his order denying the motion for preliminary injunction, that "Plaintiff has introduced evidence that has given this Court significant pause as to many of the practices that the university employs and the rules it has established to govern its investigative and disciplinary hearing process." (*Id.* at 6). However, for Judge Frost, "not even these concerns—taken together or viewed individually—suggest that Plaintiff can prevail on his due process claim." (*Id.*). The Court stayed discovery pending the outcome of the present motion to dismiss.

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## II. Legal Standard

Under Rule 12(b)(6), the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). However, "a legal conclusion couched as a factual allegation" need not be accepted as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Plaintiffs' obligation to provide the "grounds" for their claimed entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The factual allegations must "raise the right to relief above the speculative level." *Id.* The complaint must state a claim that is plausible on its face, i.e., the court must be able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955).

4

*Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011).

While generally "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss" without converting it into a summary judgment motion, *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (quoting *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997)), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment," *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007). If both parties reference and quote extensively from particular documents, and neither party contests the appropriateness of considering the documents on review of a motion to dismiss, the Court may consider the documents. *See In re Fair Fin. Co.*, ___ F.3d ___, 2016 WL 4437606, at *1 n.1 (6th Cir. Aug. 23, 2016).

Here, the parties don't dispute the appropriateness of considering the transcript of the disciplinary hearing, which both parties quote and reference throughout their briefs. The key contents of the hearing transcript are alleged in the Amended Complaint. To the extent the Court relies on any part of the hearing transcript that is not quoted in the Amended Complaint, the Court considers it integral to Doe's claims and therefore appropriate to consider.

> Challenges to subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) are categorized as either a facial attack or a factual attack. "Under a facial attack, all of the allegations in the complaint must be taken as true.... Under a factual attack, however, the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).

*McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012). Here, Defendants move to dismiss for lack of subject matter jurisdiction, arguing they are entitled to Eleventh Amendment immunity. They do not categorize their attack on subject-matter jurisdiction as facial or factual. But the Court construes it as a facial attack because Defendants do not dispute the facts alleged for purposes of Eleventh Amendment immunity.

## III.    Discussion

Defendants move to dismiss all of Doe's claims. Defendants claim Eleventh Amendment immunity for OSU and the Administrators in their official capacity. Defendants claim qualified immunity for the Administrators sued in their personal capacity.

### A.    Eleventh Amendment immunity

Defendants argue that OSU and the Administrators sued in their official capacity are immune from suit under the Eleventh Amendment. Doe concedes that OSU enjoys Eleventh Amendment immunity. But Doe argues that he is suing the Administrators in their official capacity for prospective declaratory and injunctive relief, which is one of the narrow exceptions to Eleventh Amendment immunity.

The Eleventh Amendment grants the states sovereign immunity from suits for money damages. Specifically, the judicial power of the United States, exercised through the federal courts, does not extend to a suit against a state brought by one of that state's citizens. *McCormick*, 693 F.3d at 661.[3] So, if Eleventh Amendment immunity applies, the Court lacks subject-matter jurisdiction. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015).

A suit against OSU is the same as a suit against Ohio because OSU, like Ohio's other public universities, qualifies as an arm of the state. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). Likewise, claims against state officers in their official capacity are "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). So OSU and the Administrators sued in their official capacity enjoy immunity. This includes immunity even from declaratory-judgment actions where a declaratory judgment would have "much the same effect as a full-fledged award of damages or restitution by the federal court." *Green v. Mansour*, 474 U.S. 64, 73 (1985) (permitting declaratory judgments would result in "a partial 'end run' around" the Supreme Court's Eleventh Amendment jurisprudence).

But Eleventh Amendment immunity permits an exception: "federal courts [may] enjoin state officers in their official capacity from prospectively violating a federal statute or the Constitution." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 904 (6th Cir. 2014). So "the Eleventh Amendment does not preclude a suit against [state officers] for prospective injunctive relief." *McCormick*, 693 F.3d at 662 (citing *McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000)); *see Ex parte Young*, 209 U.S. 123, 129 (1908). A claim for reinstatement constitutes pro-

---

[3] The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. But the Supreme Court has interpreted the amendment to include another class of individuals who may not sue one of the United States: a state's own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 21 (1890).

spective injunctive relief whether it is reinstatement to a job, *Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011), or reinstatement to a medical school, *see Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 307 (6th Cir. 1984).

Here, Doe does not state a claim for reinstatement or any other kind of prospective relief. In his Amended Complaint, Doe seeks, on Count I, "[j]udgment in favor of the Plaintiff declaring that the Defendants have violated the United States Constitution, the Ohio Constitution, the Ohio Administrative Code, and Title IX." (Am. Compl. at 57). On its face, Count I seeks retrospective relief. On Count II, Doe seeks "damages in an amount to be determined at trial." (*Id.*). In both counts, Doe appears to seek retrospective rather than prospective relief. Doe counters with two arguments.

First, Doe argues that his expulsion now noted on his academic record adversely affects his ability to seek employment, and a declaratory judgment would "eliminate this ongoing harm." (Pl.'s Resp. at 12, Doc. 69). If the Court did issue a declaratory judgment, it would do so to correct a previous error in the disciplinary process OSU used in this case. Of course, without this discipline on his record, Doe's employment prospects might improve. But any plaintiff could make a similar argument that a declaratory judgment to right past wrongs would cause some prospective benefit. But here, if the Court issued the declaratory judgment Doe seeks, that judgment wouldn't correct "an ongoing violation of federal law." *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 965 (6th Cir. 2013).

Second, Doe argues that he does seek reinstatement because that would be the practical effect of a declaratory judgment that OSU and the individual defendants have violated his constitutional rights. A claim for reinstatement would be prospective relief. *Hall*, 742 F.3d at 307. The Court is not persuaded that Doe seeks reinstatement. It would have been simple for Doe to ask for reinstatement: he had a chance to amend his complaint and did so without adding a request for reinstatement. While vacating OSU's discipline might have the effect of clearing the way for Doe to return to OSU, or as Doe says, it would "permit him to re-enroll," Doe doesn't even plead that he wants to re-enroll, or that it would be automatic.

Doe argues that this Court has previously held that a "plaintiff's request for a declaration that the defendants violated his due process rights qualified as prospective equitable relief because the declaratory judgment request was, in effect, part and parcel of plaintiff's request for injunctive relief." (Pl.'s Resp. at 13–14) (citing *Gies v. Flack*, 495 F. Supp. 2d 854 (S.D Ohio

2004)). In *Gies*, the eponymous plaintiff's claims for a name-clearing hearing and reinstatement to his university post were not prohibited by the Eleventh Amendment. *Id.* at 865. These claims, styled as claims for declaratory judgments, were not prohibited by the Eleventh Amendment because they were prospective, and in the case of the request for a name-clearing hearing, would "have only an incidental or ancillary effect on the state treasury." *Id.* But Gies's other claims for declaratory judgment—that the defendants violated his procedural due process rights by 1) failing to follow university procedure for detenurization[4] procedures, 2) removing the trappings of his tenure pre-detenurization, and 3) prematurely terminating him without due process—were barred by the Eleventh Amendment. *Id.* at 863–64.

Here, Doe did not request a name-clearing hearing or reinstatement. Granting Doe the relief he seeks would not have the practical effect of prospective equitable relief. Doe's claims against OSU and the Administrators in their official capacity are dismissed "because the Eleventh Amendment bars this Court from hearing them." *Id.* at 865.

### B.    Qualified Immunity

Now, what remains are Doe's claims against the Administrators in their individual capacity. Doe claims each played a role in violating his procedural due process rights. Doe identifies seven discrete violations of procedural due process. One: the investigation into Jane Roe's claims was inadequate and biased. (Am. Compl. at ¶ 57). Two: the hearing panel received training that biased the panel against Doe. (*Id.* at ¶¶ 37–39). Three: Doe was not permitted to conduct any discovery. (*Id.* at ¶ 91). Four: Doe was not permitted to effectively cross-examine Jane Roe due to questions being re-worded by the hearing panel coordinator, Matthew Page. (*Id.* at ¶ 63). Five: John Doe was denied the effective assistance of an attorney at the hearing. (*Id.* at ¶ 62). Six: Doe should have been allowed to present exculpatory expert testimony at the hearing. (*Id.* at ¶ 72). Seven: OSU should have disclosed to Doe key evidence that he would have used to impeach his accuser, Jane Roe. (*Id.* at ¶ 67).

While each individual claim has applicable due-process law, some general procedural-due-process rules will help set the framework for this discussion.

At the pleadings stage, a plaintiff must set forth facts that satisfy a two-part test to determine "whether qualified immunity applies: '(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that

---

[4] "Detenurization" is the process of removing tenure from a tenured professor.

right was clearly established.'" *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011) (quoting *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010)). This is not a heightened pleading standard. *Id.* "[D]amage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)). The Court "cannot ascribe the acts of all Individual Defendants to each individual defendant." *Heyne*, 655 F.3d at 564.

The Court "review[s] an assertion of qualified immunity to determine only whether the complaint 'adequately alleges the commission of acts that violated clearly established law.'" *Back v. Hall*, 537 F.3d 552, 555 (6th Cir. 2008) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "A constitutional right is clearly established where its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right—in other words, where it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 900 (6th Cir. 2014) (internal quotation marks omitted) (citations omitted). "To be clearly established, a right must have been decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged violation occurred." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001).

A student has a right to procedural due process in serious school disciplinary proceedings, like suspensions or expulsions. *See Goss v. Lopez*, 419 U.S. 565, 576 (1975). So here, due process applies, but how many procedural protections should Doe be afforded? In short, a person must "be given some kind of notice and afforded some kind of hearing." *Id.* at 579. But the Court must be mindful that the Due Process Clause only "sets a floor or lower limit on what is constitutionally adequate." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 639 (6th Cir. 2005).

The type of notice and the type of hearing "to which a student may be entitled depend[s] on the competing interests of those involved." *Jahn v. Farnsworth*, 617 F. App'x 453, 459 (6th Cir. 2015).

> [T]he specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved

and the fiscal and administrative burdens that the additional or substitute proce-
dural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

     The Sixth Circuit has already considered a procedural-due-process challenge to an Ohio
medical school's disciplinary process for an expelled medical student. *See generally Flaim*, 418
F.3d 629. There, the medical school used procedures that "were far from ideal and certainly
could have been better[, but] they were in the end . . . fundamentally fair." *Id.* at 637. The Sixth
Circuit found a strong private interest implicated by expulsion from medical school. *Id.* at 638.
This strong interest merited more and more formal procedures than required for a lesser sanction,
but even expulsion did not merit trial-type procedures. *Id.* at 635. While *Flaim*, doesn't require
trial-type procedures, it outlined what the Constitution requires for a fundamentally fair hearing
process.

     Generally, the hearing must be meaningful. *Id.* If the hearing is live, the accused has the
right to be present. *Id.* But the hearing need not be open to the public, formal rules of evidence
and procedure need not be applied, nor do witnesses need to be placed under oath. *Id.*
"[U]niversities need not allow active representation by legal counsel," but in certain circum-
stances it may be necessary to "ensure fundamental fairness." *Id.* at 636. The accused has the
right to make a statement and present evidence; this may include the right to cross-examine wit-
nesses. *Id.* Due process may require at least the ability to create a record of the proceeding. *Id.*
The student is generally not entitled to a reasoned opinion supporting the decision against them,
nor is the student generally entitled to an appeal. *Id.* The Court uses the term "generally" because
due process is a flexible concept and may require more or less process depending on the situa-
tion. *See id.* at 641 (discussing varying rights to cross-examination depending on what was re-
quired for a fair hearing).

     The parties disagree about how the Court should structure its analysis. Defendants say
that the Court needs to look at the allegations against each individual defendant. Doe argues that
this "atomistic" approach is wrong; the Court should instead analyze each of the procedural
problems he identifies. Both sides present part of the answer. The Court must analyze each claim
against each defendant—their liability does not necessarily rise and fall together. However, their
liability is related to the extent that they each played a role in the various parts of the disciplinary
process. This will be reflected in the Court's analysis structure: the Court adopts Doe's problem-
centric approach, analyzing each due process deficiency Doe identifies, and then, if Doe states a

plausible claim for relief, the Court analyzes which Administrators were allegedly responsible for that deficiency.

### 1. The investigation into Jane Roe's claims was inadequate and biased

Defendants argue that procedural due process does not guarantee any investigation, only that the accused will receive notice and an opportunity to be heard. Doe argues that Majarian was biased and his bias led him to conduct an incomplete investigation where he was aware of the likely existence of facts that would undermine Roe's credibility but chose to make no effort to find that evidence. Specifically, Doe alleges that Majarian knew of the existence of several facts that could have impugned Roe's credibility, but he chose not to seek that evidence.

Doe provides no authority for the proposition that the Due Process Clause requires certain thoroughness to an investigation. To be sure, the aim of due process is a fair process. But "[t]he Due Process Clause does not require a particular kind of investigation . . . ." *Nguyen v. Univ. of Louisville*, No. CIV.A. 3:04-CV-457-H, 2006 WL 1005152, at *4 (W.D. Ky. Apr. 14, 2006). The procedural-due-process analysis focuses on the decision-maker, not the investigator. *See Kolley v. Adult Protective Servs.*, 725 F.3d 581, 586–87 (6th Cir. 2013) (dismissing procedural-due-process claims against social workers and investigators because it was the juvenile court's duty, and not the investigators' duty, to provide notice and a hearing). Due process provides, not a guarantee of a perfect investigation, but notice and an opportunity to be heard by a neutral decisionmaker. Here, any claims of bias in the investigation don't implicate these due process concerns.

Since Doe identifies no violation of a clearly established right to a thorough and neutral investigation, the Administrators are entitled to qualified immunity on this point. And since the only allegations against Majarian are that he performed an inadequate investigation, he is entitled to qualified immunity.

### 2. The hearing panel members received training that biased them against Doe

Doe argues that the five-member hearing panel was trained in a manner to produce bias. Specifically, Doe alleges the panel members received training on sexual assault prevention and understanding sexual coercion and aggression. Doe alleges that this training encouraged the panel members to empathize with victims rather than to evaluate each case dispassionately on the merits. Defendants argue that Doe's allegations cannot overcome the legal presumption that adjudicators act with honesty and integrity.

"[A] biased decisionmaker [is] constitutionally unacceptable, [and] 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). But "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias." *McMillan v. Hunt*, 968 F.2d 1215 (6th Cir. 1992) (unpublished table decision) (citing *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985)); *see also Hill v. Bd. of Trs. of Mich. State Univ.*, 182 F. Supp. 2d 621, 628 (W.D. Mich. 2001). Actual bias could be "personal animosity, illegal prejudice, or a personal or financial stake in the outcome." *Ikpeazu*, 775 F.2d at 254. To survive a motion to dismiss, Doe needs to allege specific, non-conclusory facts that if taken as true show actual bias.

Doe alleges, generally, that the panel members were trained in a manner intended to produce bias against men accused of sexual misconduct. He alleges that the panel members received training on sexual misconduct and how to prevent sexual assault but did not receive any training on the due process rights of students accused of sexual misconduct. Doe alleges the training included viewing presentations and videos that had the effect of biasing the panel members in favor of victims and prejudicing the panel members against men accused of sexual misconduct. For example, the panel members were presented statistical evidence that "22-57% of college men report perpetrating a form of sexual aggressive behavior." (Am. Compl. at ¶ 38). And, "[c]ollege men view verbal coercion and administration of alcohol or drugs as permissible means to obtain sex play or sexual intercourse." (*Id.*). "Repeat perpetrators are aware of myths and how to present and empathic." (sic). (*Id.*). "Sex offenders are experts in rationalizing behavior." (*Id.*). Doe alleges panel members were trained to "identify and understand characteristics of individuals who pose a risk to the safety of the community." (*Id.*).

The Court must accept these allegations as true, view them in the light most favorable to Doe, and draw all reasonable inferences in favor of him. Doe has alleged specific, non-conclusory facts to state a plausible claim that OSU's training produced biased panel members. He does not allege that the panel members received any other training; in fact, he alleges that the panel members received no training about "protecting the due process rights of the accused." (Am. Compl. at ¶ 38). If the training Doe alleges was the only training given to the panel members, it's plausible that OSU trained its panel members in a manner that produced actual bias. Admittedly, he presents no allegations that any specific panel member had any particular animus

towards him. But with only his allegations to go on, the Court is left to analyze a plausibly one-sided training process.

The Court does not mean to say that any of OSU's training is untrue or not worthwhile or that the university's alleged goal of aiding victims and creating a safer campus community should not be lauded. Indeed,

> [t]here is not exactly a constituency in favor of sexual assault, and it is difficult to imagine a proper member of the Hearing Committee not firmly against it. It is another matter altogether to assert that, because someone is against sexual assault, she would be unable to be a fair and neutral judge as to whether a sexual assault had happened in the first place.

*Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 31–32 (D. Me. 2005).

The Court could assume that the training Doe alleges is not the only training the panel members received, but at the Rule 12 stage, the Court is required to accept the plaintiff's allegations as true and view them in the light most favorable to the plaintiff. This means operating under the assumption that the panel members received only the training Doe alleges and no training or direction on their role as fair and neutral judges. This, if true, plausibly alleges the panel members had illegal prejudice to individuals in Doe's position, which amounts to actual bias.

But Doe does not specifically identify which of the Administrators were responsible for the training. The Amended Complaint implicates Brennan as the official responsible for Title XI compliance and training. (Am. Compl. at ¶ 8). Doe does not allege that any of the other Administrators played any role in the allegedly bias-inducing training. The Court will deny the motion to dismiss as to Administrator Kellie Brennan, but will grant the motion as to the other Administrators because Doe has not alleged that any of them were responsible for the training. The Court will permit limited discovery on the issue of the panel members' training in order to resolve the issue of whether Brennan is entitled to qualified immunity.

### 3. Doe was not permitted to conduct any discovery before the hearing

Doe raised this generic allegation, but he fails to pursue it in his response to Defendants' motion to dismiss. In any event, there is no clearly established due process right to formal discovery in university disciplinary hearings. *See, e.g.*, *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 520 (10th Cir. 1998) ("The Due Process Clause does not guarantee that parties to an adversarial proceeding may discover every piece of evidence they desire. Indeed, civil litigants in federal court do not have a claim for a violation of their Fourteenth Amendment rights every time a federal district judge or a federal magistrate rules against them in a discovery dispute."). The

Court will later address in detail Doe's claims that he is entitled to some specific disclosures, but on Doe's claim that he is entitled to general discovery before the disciplinary hearing, the Administrators are entitled to qualified immunity.

**4. Doe was not permitted to effectively cross-examine Jane Roe because the hearing panel re-worded some of Doe's questions**

The Due Process Clause generally does not guarantee the right to cross-examination in school disciplinary proceedings. *See Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 925–26 (6th Cir. 1988). But where a disciplinary proceeding depends on "a choice between believing an accuser and an accused . . . cross-examination is not only beneficial, but essential to due process." *Flaim*, 418 F.3d at 641 (holding that due process was not violated when cross-examination would have been a fruitless exercise, so this language is dictum).

Here, Doe was permitted to cross-examine witnesses at the hearing, but Doe alleges that he was denied the right to cross-examine witnesses effectively. He couldn't do so effectively because the hearing panel reworded his questions and thereby dulled their effectiveness. Here's an example:

"John Doe attempted to ask Jane Roe, 'You waited ten months to bring this forward. Why is that?' Page changed the question to, '[Jane Roe], would you like to explain that, why you brought it in the time you did?'" (Am. Compl. at ¶ 63) (quoting hearing transcript).

But none of the panel's re-wordings so blunted Doe's questions as to render them useless. Furthermore, nothing prevented Doe from arguing these points in his closing statement. Further still, all of the questions Doe alleges the panel re-worded do not so alter their content that the panel could not understand their significance. Since Doe was permitted to cross-examine witnesses at the hearing, and he has no clearly established right to a trial-type cross-examination, Defendants are entitled to qualified immunity on this point.

**5. Doe was denied the effective assistance of an attorney**

Doe alleges that he was denied the effective assistance of an attorney at his disciplinary hearing because Doe's attorney was only permitted to pass him notes and whisper advice. But there is no due process right to active representation by legal counsel in a university disciplinary hearing. *Flaim*, 418 F.3d at 636. However, the Due Process Clause may require counsel "to ensure fundamental fairness when the school proceeds through counsel or the procedures are overly

complex. . . . [or] the student is also facing criminal charges stemming from the incident in question." *Id.* (citation omitted).

Here, Doe does not allege that OSU proceeded through counsel, or that the hearing procedures were overly complex, or that he faced any criminal charges stemming from the incident. In any event, Doe was advised by counsel throughout the process. Because Doe did not have a clearly established right to active representation by legal counsel, and because a lawyer did advise Doe throughout the hearing process, the administrators are entitled to qualified immunity on this point.

### 6. Doe should have been allowed to present exculpatory expert testimony at the hearing

Doe retained an expert from the medical school who formed an opinion about Jane Roe's blood alcohol level at the time of the incident after reviewing evidence of how many drinks she consumed and her height and weight. Doe alleges that he was denied due process because Page would not permit Doe's expert witness to testify at the hearing.

But there is no due process right to expert testimony in student disciplinary hearings, let alone is such a right clearly established. Doe argues that the *Mathews* test counsels in favor of permitting this testimony because the risk of erroneously expelling Doe from OSU increased when the evidence was excluded. But the evidence wasn't excluded entirely—Doe gave his expert's qualifications and either read or summarized the expert's findings at the hearing. (Hrg. Trans. at 304–307, Doc. 15). This was more than sufficient to allow Doe to "present his side of the story" and mitigate any risk of erroneously depriving him of his rights. *Goss*, 419 U.S. at 581.

The third *Mathews* factor—"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," 424 U.S. 319 at 335—also favors the Administrators. The fiscal and administrative burden on a university would be significant if it had to retain experts, present live expert testimony at student disciplinary hearings, and prepare a cross-examination of the other side's expert witness. In short, the *Mathews* test tilts away from requiring this procedure, even in this case where there was only one expert witness offered. In any event, the right to present live expert-witness testimony is not a clearly established due process right in the student disciplinary context. Therefore, the Administrators are entitled to qualified immunity on this issue.

**7. Defendants' failure to disclose key evidence denied Doe the right to effective cross-examination**

Doe argues that the Administrators knew of evidence that he could have used to impeach Jane Roe's credibility, but they did not disclose that evidence to Doe. Then, at the hearing, Jane Roe said, "their decision to keep me in school and to allow me to continue next year in the fall was already decided before my decision to report this assault." (Am. Compl. at ¶ 67). Doe alleges that he would have impeached Roe on this statement if he had the evidence that OSU had. Here are the facts Doe alleges OSU and its Administrators failed to disclose, "[s]pecifically: (a) Jane Roe reported that she was a victim of sexual assault only after she received notice that she was going to be expelled from school; (b) Jane Roe was permitted to remain in school solely because she claimed to be a victim of sexual assault; and (c) Jane Roe misrepresented to the Hearing Panel her motivation for bringing the allegations and the timing of her disclosure." (Pl.'s Resp. at 25 (from Am. Compl. at ¶¶ 51–52, 63–64, 67, 69)).

Doe argues that *Brady* requires OSU to disclose this evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963). The Administrators argue that federal statutes prohibit them from disclosing this evidence. And while *Brady* may not require this disclosure, and its disclosure may conflict with a federal statute, the Due Process Clause may require it.

*Brady* imposes an affirmative duty on criminal prosecutors to "disclose evidence favorable to a defense." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (citing *Brady*, 373 U.S. 83). Doe argues that courts require government agencies to offer *Brady*-type disclosures in civil matters, citing *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993). But in *Demjanjuk*, the Sixth Circuit extended *Brady* to "cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against." *Id.* There, the court made explicit reference to the fact that *Brady* applied because the government "sought to denaturalize Demjanjuk" in part on the basis that he "was guilty of mass murder." *Id.* There, the government attorneys had a constitutional duty to produce *Brady* material at least in part because "[t]he consequences of denaturalization and extradition equal or exceed those of most criminal convictions." *Id.* at 354.

Here, there is no criminal case and certainly no mass murder. The Court is aware of no controlling "case law extending the [*Brady*] rule to civil matters, much less student disciplinary proceedings." *Tanyi v. Appalachian State Univ.*, No. 5:14-CV-170RLV, 2015 WL 4478853, at

*5 (W.D.N.C. July 22, 2015) (finding no case law in the Fourth Circuit to support such an extension). The Court will not extend *Brady* to the context of university disciplinary proceedings.

Disclosing this information presents a second problem. If the Due Process Clause requires OSU to disclose the accommodations it makes for alleged victims of sexual misconduct, that requirement may be in conflict with a federal statute.[5] The Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, prohibits the disclosure of "personally identifiable information" in student academic records. Here, the accommodation Jane Roe received is part of her academic record at OSU. Disclosing this accommodation would likely violate FERPA.

Doe argues that OSU can disclose educational records in the context of university disciplinary hearings without violating FERPA. That's true: universities may disclose the "final results" of disciplinary proceedings in a limited way, *see* 20 U.S.C. § 1232g(b)(6), and universities may disclose student records to other school officials who have a "legitimate educational interest[]" in the records, *see* 20 U.S.C. § 1232g(b)(1)(A). Neither of these exceptions apply to Doe. He's not a school official with a legitimate educational interest in Jane Roe's records, nor are the records the "final result" of a disciplinary proceeding.

Doe offers a solution: OSU could have simply redacted the records to eliminate all of Jane Roe's personally identifiable information. Doe argues this would have preserved Jane Roe's anonymity while providing him the information he needed to effectively defend himself in the disciplinary hearing. But if John Doe requested Jane Roe's educational records, and OSU provided him records with the name redacted, he would have a good reason to believe they were Jane Doe's records. The regulations contemplate this exact situation, defining the term "personally identifiable information" to include "[i]nformation requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates." 34 C.F.R. § 99.3. It appears that releasing Jane Roe's academic records to Doe—even redacted versions—would violate FERPA.

But *Brady* and FERPA aside, Doe alleges that he was denied the opportunity to present his side of the story because the Administrators withheld a critical piece of information. As Magistrate Judge Kemp put it, "No attorney, when cross-examining a witness, can be expected to

---

[5] This argument also implicates the constitutional-avoidance canon of statutory construction. That canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Neither party raised this argument in their briefs.

think of and ask all relevant questions without some ability to identify fruitful areas of cross-examination in advance. That is why discovery is available in civil cases, and the rule of *Brady v. Maryland*, 373 U.S. 83 (1963) has been interpreted to require the disclosure of impeachment evidence in criminal cases." (R&R at 14, doc. 66). The Court has rules to apply in adversary proceedings. But here, without discovery or mandatory disclosures, Doe is left to rely on the beneficence of the university administrators. Doe only has what he can unearth and what OSU provides to form the basis of any cross-examination. In this case, Doe alleges that he had no way to know about critical evidence that would impeach his accuser's credibility, and this was a case where the panel's decision hinged on a credibility decision. Specifically, one panel member asked John Doe "Why do you think [Jane Roe] should say – she would say she didn't remember anything from that night? What would be her motivation?" (*See* Am. Compl. at ¶ 68). When asked at the hearing about the timing of her sexual-misconduct complaint, it is at least arguable that Jane Roe made a false or misleading statement. Doe could not impeach her because he didn't have the evidence of the timing of her accommodation.

The right to some form of cross-examination in university expulsion hearings is a clearly established due process right when cross-examination is "essential to due process," as in a case that turns on "a choice between believing an accuser and an accused." *See Flaim*, 418 F.3d at 641 (dicta). Given the facts alleged, it is plausible that Doe's right to cross examination was effectively denied by the Administrators' failure to turn over critical impeachment evidence. But the right to mandatory disclosures of any impeachment evidence is not a clearly established constitutional right in the student disciplinary context. Given the flexibility of the Due Process Clause, this situation may call for the disclosure of key impeachment evidence. If the Administrators knew that Jane Roe lied about the timing of her accommodation at the hearing and permitted her testimony to stand unrebutted, that plausibly violated John Doe's right to a fundamentally fair hearing, regardless of whether the issue is construed as one of cross-examination or disclosure.

But which Administrators are implicated by Doe's allegations that he did not receive a fundamentally fair hearing?

Javaune Adams-Gaston: Doe alleges that she "has responsibility for the administering and operating aspects of the OSU Student Code of Conduct and Judicial System, and ultimately made the final decision about whether John Doe may remain a student at OSU." (Am. Compl. at

¶ 5). Adams-Gaston, as the one ultimately responsible for the disciplinary process, is implicated by Doe's allegations.

Matthew Page: Page was responsible for administering Doe's disciplinary hearing, and he "was likely aware of Brennan's actions on behalf of Jane Roe and other victims to obtain accommodations." (Am. Compl. at ¶ 67). Page also knew that "the credibility of Jane Roe was an important issue in this case." (*Id.* at ¶ 74). Page was at the hearing and heard Jane Roe's allegedly false or misleading statement. Page is therefore implicated by Doe's allegations.

Kellie Brennan: "was aware the credibility of Jane Roe was one of the key issues in the case. . . . [and] was likely aware that the Hearing Panel was not told about the significant accommodation received by Jane Roe." (*Id.* at ¶ 74). Brennan was also aware of the accommodation provided to Jane Roe. (*Id.* at ¶ 45). In her capacity as OSU's Title IX Coordinator, she "serves as consultant to any disciplinary hearing panel." (*Id.* at ¶ 32). Doe alleges that Brennan was "aware that Jane Roe made false and misleading statements about the accommodations she had obtained, including that but for her claim that she was a victim of sexual assault she would have been dismissed from the medical school." (*Id.* at ¶ 68). Doe's allegations implicate Brennan.

Natalie Spiert: Doe alleges she "was aware of the accommodations provided to Jane Roe as a result of her claim that she was a victim of sexual assault." (*Id.* at ¶ 67). Doe alleges that "Jane Roe, with the assistance of Spiert, made a concerted effort to mislead the Hearing Panel about the timing of her disclosure and her motivations." (*Id.* at ¶ 67). Doe's allegations implicate Spiert.

Jeff Majarian: Doe alleges only that Majarian would have known about the accommodation made for Jane Roe if he had conducted a thorough investigation of Jane Roe's claims. But as this Court has already held, the Due Process Clause does not require a more thorough investigation in the context of university disciplinary proceedings. (*Supra* at § III.B.1.). Doe does not allege that Majarian played a role in the notice or hearing process except to the extent that the results of his investigation were included in the hearing packet. The hearing packet was provided to the hearing panel; it contained summaries of statements from Jane Roe, John Doe, and other witnesses. (Am. Compl. at ¶ 64). Majarian is entitled to qualified immunity because Doe has stated no specific allegations that Majarian violated clearly established law by failing to disclose key impeachment evidence.

The Court will deny the motion to dismiss as to the other four Administrators. Doe suggests that the Court defer ruling on qualified immunity until the parties have conducted additional discovery. (Pl.'s Resp. at 31).

"Although an officer's 'entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (alteration in original) (internal citation omitted) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)); *see also Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (discussing how a district court cannot avoid ruling on the issue of qualified immunity in the context of a motion for summary judgment). The concern at the Rule 12 stage is whether the plaintiff has alleged "facts which, if true, describe a violation of a clearly established statutory or constitutional right of which a reasonable public official, under an objective standard, would have known." *Kennedy v. City of Cleveland*, 797 F.2d 297, 299 (6th Cir. 1986). Even if the plaintiff has done so, the defendant may still be entitled to summary judgment on the basis of qualified immunity "if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Doe cites a Fifth Circuit case for authority that "a district court "may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). The Sixth Circuit has not been explicit, like the Fifth Circuit has, about adopting a plan of narrowly tailored discovery to determine the issue of qualified immunity, but such a plan is consistent with the purposes of qualified immunity, namely, that "insubstantial claims against government officials be resolved . . . . at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (citations omitted) (internal quotation marks omitted). But whether it's the Court defers its ruling or a simply denies Defendants' motion to dismiss, the Court will not make a final ruling on the issue of qualified immunity until after limited discovery.

Here, the Court will grant in part and deny in part the motion to dismiss and permit limited discovery. If discovery fails to uncover sufficient evidence that the Administrators violated Doe's due process rights, then the Administrators may be entitled to qualified immunity. The Court will permit limited discovery on two issues pertaining to the Administrators' claim for qualified immunity.

One: the issue of the hearing panel members' training.

Two: the issue of the failure to disclose information about Jane Roe's accommodation.

To answer the question of whether any of the remaining four Administrators are entitled to qualified immunity, the Court needs to answer the following questions:

(1) In the hearing, did Jane Roe make a false or misleading statement about the timing of her accommodation?

(2) Which of the Administrators knew about her accommodation?

(3) Which of the Administrators knew about her allegedly false or misleading statement in the hearing?

(4) When did Jane Roe first report the alleged sexual misconduct to OSU?

(5) What training did the panel members receive?


## IV. Conclusion

The Court therefore **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss. (Doc. 55). Defendant OSU is dismissed. Defendant Administrator Majarian is dismissed. The Court reserves ruling on the issue of qualified immunity as to the remaining Administrators.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE:  November 7, 2016