**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **JOHN DOE**, | **Case No. 2:15-cv-2830** |
| Plaintiff, | |
| | **Judge Graham** |
| **v.** | |
| | **Magistrate Judge Vascura** |
| **THE OHIO STATE UNIVERSITY, et al.,** | |
| Defendants. | |

## OPINION & ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment on the is-
sue of qualified immunity with respect to Plaintiff's due process claims. (Doc. 116).

The limited discovery permitted in the Court's order, (Doc. 82), has given the Court a
much better understanding of this case. Here, John Doe, a male, fourth-year medical student on
track to receive a combined MD/MBA degree was expelled after a female medical student, Jane
Roe, who had twice failed the first year of medical school was able to obtain a reprieve from
dismissal after reporting that John Doe engaged in non-consensual sexual activity with her while
she was under the effects of alcohol. Jane Roe claimed that she suffered a "blackout" and could
not remember what happened but realized that sexual conduct had occurred between them when
she woke up naked in John Doe's bed the morning after a night of partying.

Jane Roe had not reported this alleged sexual assault to the university at any time during
the 10 month interval between the night in question and her receipt of a letter from the medical
school that called her before a review committee and warned she could be dismissed for academ-
ic failure. In the academic review proceeding that followed, she blamed her academic failure on
the emotional consequences of the alleged non-consensual sexual activity. The university granted
her an academic accommodation—the opportunity to restart the first year of medical school for a
third time—on the ground that her grades had suffered as a result of the non-consensual sexual
activity.

1

A disciplinary charge was then leveled against John Doe, and a disciplinary proceeding was held. John Doe testified that the sexual encounter was consensual and that although Jane Roe had been drinking some hours before, she was not incapacitated when they had sex. Jane Roe testified that she was so intoxicated she could not remember the event.

Not surprisingly, the credibility of the two—John Doe and Jane Roe—was the pivotal issue. Jane Roe asserted that she had no motive to lie and argued that, on the contrary, it was John Doe who had a lot to lose: expulsion from the medical school before entering his final year. One of the hearing board members asked a question about this to John Doe, asking John Doe if he knew why Jane Roe would make this up? And, what would be her motivation to lie? John Doe, who knew nothing about the academic accommodation Jane Roe had received could only reply, "I can't speak for [Jane Roe]." (Disciplinary Hrg. Trans. at 269:25–270:1, Doc. 15).

Doe claims that the university denied him the ability to provide the decisionmakers with important evidence relevant to Jane Roe's credibility, including the fact that she avoided dismissal from medical school by asserting that her academic failure was caused by his alleged sexual misconduct and that she may have lied when she said that she didn't report his alleged sexual misconduct to the university until the medical school's academic committee had already decided to permit her to restart her first year of medical school for the third time.

## I.  Background

### A.  Procedural History

The plaintiff, proceeding under a pseudonym, John Doe, sued The Ohio State University ("OSU") and five of its administrators (collectively, "Defendants"), alleging that, among other things, they denied him due process when they expelled him from the university. John Doe, was an MD/MBA student at OSU. OSU expelled Doe after a hearing board at the university found Doe "responsible" for violating the university's sexual misconduct policy.

The Court dismissed most of Doe's First Amended Complaint but allowed one claim to proceed against four of the administrators. (Op. & Order, Doc. 82). The Court outlined a narrow scope of discovery to resolve the issue of whether the remaining Defendants were entitled to qualified immunity. (*See id.*). The Court, after an intervening, relevant Sixth Circuit decision and Motion for Reconsideration from Doe, brought back Doe's claim for injunctive relief. (Order, Doc. 104). In the meantime, the Court also granted Doe leave to amend his complaint, and he did

so, adding Title IX claims, which are the subject of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint: Title IX Claim, (Second Am. Compl., Doc. 99; Defs.' Mot. Dismiss, Doc. 131). For relief, Doe seeks both money damages under § 1983 and injunctive relief.

### B. Factual Background

John Doe began medical school at The Ohio State University in August 2011. In May 2015, he was a fourth-year graduate student, pursuing both a medical degree and an MBA. He was in the last year of his training and expected to graduate in May of 2016. He was preparing to apply for residencies in emergency medicine. His friends described him as a hard worker who was more likely to be up late studying than out at a bar.

Jane Roe began medical school at OSU in the fall of 2013. She was failing her first-year classes. Before taking a final exam, Roe requested and was granted a leave of absence. Roe then asked to restart the first-year medical school curriculum. The medical school's Academic and Behavioral Review Committee (the "ABRC") decided to grant Roe's request to re-enroll and imposed a few stipulations, including requiring Roe to complete summer preparation courses, continue study-strategy counseling, and participate in tutoring.

Roe restarted the first year of medical school in the fall of 2014. She failed the first year of medical school again. On March 23, 2015, Dr. Douglas Danforth wrote a letter to the ABRC chairwoman referring Jane Roe to the ABRC because of her second failure of the first-year medical school curriculum. Dr. Danforth said, "[s]ince this is [Jane Roe's] second attempt at Part One, my recommendation is that the ABRC consider dismissal from the College of Medicine." (PageID 1552).

John Doe and Jane Roe met in early 2013 through a joint project that never came to fruition. The two reconnected in June 2014. John Doe reports that the two were at a bar celebrating the end of third year tests. John Doe reports that they were "talking and flirting, and we decided to hang out again sometime." (PI Hearing Trans. at 15:13–14, Doc. 67). John Doe thought Jane Roe was interested in him: he reports that she made comments about his body, playfully spanked his "glutes," and, two days later, Jane Roe texted John Doe saying she wanted to "hang out for part 2." (Disciplinary Hrg. Trans. at 220:1–3). The two exchanged text messages over the next two weeks and ultimately met at bar where Jane Roe was with friends. That's where the stories diverge: the night that Jane Roe claims she was sexually assaulted.

3

Jane Roe claims that she was intoxicated, suffered a "blackout," and can't remember anything after about 12:00–12:30 a.m. of the night in question. Jane Roe's night revolved around a friend's birthday celebrations. She first went with that friend and others to dinner, then to that friend's house, then to a bar called Callahan's. In the five and a half hours before 12:30 a.m., she had six alcoholic drinks: a glass of wine with dinner from 7:00 p.m. to 9:00 p.m., then three drinks within 90 minutes from 9:00 p.m. to around 10:30 p.m. at her friend's house, then another two drinks at Callahan's from around 11:00 p.m. to 12:00 a.m.. In the last 3-3.5 hours before she says she can't remember anything, Jane Roe had five liquor drinks, including three shots.

Witness testimony on whether Jane Roe was significantly impaired is conflicting. She says she was completely intoxicated and suffered a blackout. John Doe says she was aware, communicative, engaged, and didn't exhibit signs of significant impairment. The other witnesses' testimony is equivocal and conflicting.

Jane Roe claims she can't remember anything after about 12:00 a.m. at Callahan's, so all information from this point on is from third-party witnesses and John Doe. Other witnesses recount her arriving at another bar about a block away, Gaswerks, around 12:30 a.m.. Jane Roe's text messages to John Doe from around this time corroborate this. John Doe received Jane Roe's text message, informing him she was at Gaswerks, so he and two friends left to meet her there.

John Doe and two friends met up with Jane Roe at Gaswerks. In the group of friends, Doe says he only talked to Jane Roe, and eventually they removed themselves from the group conversation to talk alone on the bar's patio. One of the witnesses reported seeing the two "giggling and having a good time" on the patio by themselves. (*Id.* at 48:14–19). John Doe and Jane Roe apparently talked at length, and eventually were kissing on the patio. At this point, according to Doe, the two confessed their attraction to one another, and the conversation turned sexual. Doe says he asked her if she wanted to go home with him; she declined, citing their common friend group, that she was too old for him, and the risks and consequences of being together. Some time passed, and John Doe says he asked again, Jane Roe agreed, and the two walked to John Doe's car, which was parked some considerable distance away (John Doe says it was past two other bars and a parking lot). (*Id.* at 227:18–24). The two then went to John Doe's apartment, drank some water, watched TV on the couch, and spoke briefly with John Doe's roommate. Then, at about 3:00 a.m., the two went to John Doe's bedroom and engaged in sexual activity. John Doe recounts their encounter in detail, including specific examples of Jane Roe's ac-

tive participation and awareness during the encounter. Jane Roe says she can't remember anything about her sexual encounter with John Doe.

The next morning, again, accounts diverge. John Doe says that when he and Jane Roe woke up, they were affectionate, talked about travel, and he tried to initiate sex with Jane Roe. She declined to have sex, and they didn't. They looked at pictures on John Doe's phone of his trips to Asia and discussed hobbies. Jane Roe asked to borrow some of John Doe's clothes before leaving his house. Eventually, John Doe took Jane Roe, dressed in his clothes, back to her house, where she leaned in to give him a kiss goodbye. Later that afternoon, Jane Roe sent John Doe a text message, saying "Thanks again for taking me home last night. Re-read this text this morning. Glad you can decipher bourbon talk." (*Id.* at 238:4–7).

Jane Roe's account of the next morning is quite different. She says she woke up naked, confused, and scared. She saw John Doe and was shocked. She first asked John Doe what happened, to which he replied that Jane Roe was really drunk, he took her home, and they had sex. She was disturbed to see her phone off and her clothes folded and hung up. She says that John Doe started touching her, and she reciprocated because she "felt like I had to." (*Id.* at 163:21–22). She laid "frozen" as he kissed her many times. She told him that she didn't want to have sex, and they didn't. She explains that she tried to make normal conversation "so that we wouldn't have to continue the physical contact." (*Id.* at 164:10–11). She "didn't feel comfortable enough to say, hey, don't touch me anymore." (*Id.* at 164:17–19). While it may have appeared to John Doe that nothing was amiss, this was Jane Roe's coping mechanism, a way to make "sure that I had control, that we're friends." (*Id.* at 164:22–24). She told John Doe that she wanted to go home, put on some of John Doe's clothes, and he drove her home. She said that they "kissed at the end of the encounter because I just wanted to make everything seem rational, seem like I was in control, because I was in a state of shock and I had no idea what was going on." (*Id.* at 165:18–22).

Jane Roe's version of the subsequent weeks is somewhat different than John Doe's. According to her, the two met at a happy hour at a restaurant to exchange clothing, so Jane Roe brought the clothing with her, but John Doe left Jane Roe's clothes at his apartment and left her undergarments in his bedroom. Jane Roe went to his apartment to retrieve her undergarments and did so, and John Doe tried to kiss her several times, with Jane Roe rebuffing each attempt. She

reports texting with John Doe over the next months, but only cordially as friends, never in an attempt to initiate dates or furthering a relationship.

According to John Doe, Jane Roe texted him thanking him for taking her home and continued to text him throughout the next weeks, and they made plans to go out for food and drinks. They eventually did meet up and went out for drinks and food at two different restaurants. In the weeks that followed, the two exchanged numerous text messages. This continued, casually, for the following months. Five months after their encounter, Jane Roe was still sending John Doe unsolicited text messages, wishing him good luck on exams, wishing him happy birthday, offering to take him out for his birthday, or even a "playful text about [John Doe's] muscles." (*Id.* at 250:16–17). Nearly seven months after their encounter, the two ran into each other while walking outside of the hospital. Jane Roe noticed John Doe jogging, said hello, and gave him a hug. They exchanged pleasantries then went their separate ways. This was the last time before the disciplinary hearing that the two spoke face-to-face, in January 2015.

On March 23, 2015, Jane Roe was informed by OSU that she failed the first year of medical school again. The first-year academic program director at the medical school, Dr. Danforth, recommended her to the ABRC for a hearing, and he recommended to the ABRC that it consider dismissing her from the medical school. (March 23, 2015 Letter, Doc. 114-2 at PageID 1552).

Following up on Dr. Danforth's letter, on March 26, 2015, the ABRC notified Jane Roe that she was being referred to the committee because she failed the first-year medical school curriculum for a second time. The ABRC stated that its job was, in part, to review Roe's "performance to date in the College of Medicine and determine recommendations regarding your continuation in the College." (March 26, 2015 Letter, Doc. 114-2 at PageID 1547).

On April 2, 2015, Jane Roe informed Natalie Spiert, the assistant director of the Sexual Civility and Empowerment Program at OSU, that she was a victim of sexual assault. (PI Hrg. Trans. at 249:15–16; 260:12–14). One of Spiert's jobs at OSU is to "provide direct one-on-one support for all students who experience any form of sexual violence." (*Id.* at 249:21–23). Jane Roe told Spiert that she was at risk of failing out of medical school. (*Id.* at 260:15–18). Spiert agreed to attend the ABRC hearing with Roe and write her a letter of support.

On April 15, 2015, Roe appeared before the ABRC. She told the ABRC that part of the reason she failed the first year of medical school for the second time was the fact that she was dealing with the fallout from being sexually assaulted over the summer. She asked the ABRC to

allow her to continue in the medical school curriculum. Jane Roe outlined a plan to continue in the medical school that included a plan to officially report "the sexual assault via the university conduct board." (ABRC Meeting Minutes, PageID 1581). Jane Roe also asked for more time to remediate an exam so she could "work with OSU on the assault reporting process." (*Id.*). Natalie Spiert was present at the ABRC hearing as one of two advocates for Jane Roe. Spiert supported Jane Roe's "wish to continue in the program." (*Id.*). Spiert also informed the ABRC about "a federal requirement for everything in the reporting process to be completed in 60 days once a formal report is given. She stated that [Jane Roe's] participation would total anywhere from 15–25 hours, including giving the initial statement and attending the hearing. She also stated the Student Conduct Board will make all necessary accommodations for [Jane Roe]'s academic commitments." (*Id.*). The ABRC minutes state that "[Jane Roe] plans to officially report the incident in the near future." (*Id.*). The ABRC minutes show the committee's decision to allow Jane Roe to re-enroll in the medical school, and the committee noted it would advise Jane Roe to "determine her course of action regarding the University process for reporting and addressing her complaint . . . and try[] to complete any needed steps prior to restarting the curriculum." (PageID 1582).

On April 21, 2015, the ABRC informed Roe in writing that "[i]n acknowledgement of the apparent impact of the personal incident which you described as affecting your performance, you will be granted the opportunity to restart LSI Part One, Year 1, in August, 2015." (April 21, 2015 Letter, Doc. 114-2 at PageID 1550).

On April 30, 2015, Jane Roe met with Jeff Majarian to provide him with information about the alleged assault. (Jane Roe Dep. at 90–91, Doc. 114-1). Majarian was responsible for the investigation into Jane Roe's allegations and the production of the hearing packet of information given to the disciplinary hearing board.

### C.  The Disciplinary Hearing

OSU held John Doe's disciplinary hearing on July 15, 2015. The hearing was convened to determine whether John Doe was responsible for violating three sections of OSU's Code of Student Conduct: (1) endangering behavior, (2) nonconsensual sexual intercourse, and (3) nonconsensual sexual contact. (Disciplinary Hrg. Trans. at 1). John Doe and Jane Roe were both present, each with an advisor: Natalie Spiert advised Jane Roe, and an attorney, Fran Ward, advised John Doe. (*Id.* at 2). Jane Roe and John Doe both made opening and closing statements and

testified at the hearing. Seven other witnesses also testified. (*Id.* at 3). Matthew Page was the hearing coordinator in charge of conducting the hearing. (*Id.* at 4). There were five hearing board members present, all of whom were employed by OSU as either faculty or staff members; they were allowed to ask questions of the witnesses. (*Id.* at 4–5).

Jane Roe presented her case to the disciplinary board first. She stated that John Doe sexually assaulted her. (*Id.* at 10:25–11:1). She said she couldn't remember the assault, but that she didn't make "a conscious choice to have sex with [John Doe]." (*Id.* at 11:18). She stated that her "goal in reporting this assault is so that no one else will experience the depression, anxiety, and hopelessness that I experienced." (*Id.* at 12:13–16). She stated that she was reporting the assault "to gain personal closure and fulfilling an ethical obligation." (*Id.* at 12:17–19).

John Doe explained to the hearing board that he would clear himself of the charges by presenting eyewitness accounts of Jane Roe's sobriety, by providing character witnesses, and by providing testimony of Jane Roe's actions before, during, and after the encounter, all of which are "inconsistent with actions you would take with someone that you believe . . . raped you." (*Id.* at 14:14–16).

The hearing board heard from several witnesses. The witnesses are identified by name in the hearing transcript but their names won't be recounted here to preserve the anonymity granted to Jane Roe and John Doe.

Jane Roe was cross-examined at length by John Doe, pages 177 to 216 of the hearing transcript to be exact. (Doc. 15). Doe asked her how she was doing in school when she accused him of sexual assault. After Jane Roe objected to the question, Page asked John Doe what relevance the question had. John Doe explained that, according to the policy of the College of Medicine, if a person has to repeat a year twice, "it's reason for withdrawal. It's in our book. So I'm curious to know if there's any sign of failed tests, fail out, second attempt, not able to re-enroll." (*Id.* at 208:9–19). Page then restated the question to Jane Roe: "[John Doe] had asked how well you have done academically this year." (*Id.* at 209:8–9). Jane Roe said,

> I had to present this case to the Academic and Behavior Review Committee and tell them about this assault and how it affected me throughout this year. And it was extremely challenging to talk to five – or around five physicians that I have never met in my life, strangers, about something very personal to me.
> And I told them about this incident and how it affected my life. And I did not name any names. *And their decision to keep me in school and to allow me to*

> *continue next year in the fall was already decided before my decision to report*
> *this assault.*

(*Id.* at 209:8–23) (emphasis added).

Near the end of John Doe's testimony, one of the board members asked John Doe the fol-

lowing question: "[T]here seems to be no motivation for [Jane Roe] to make this up. Why do you

think she claims she doesn't remember what happened?" (*Id.* at 269:10–270:1). John Doe re-

plied, "I can't speak for [Jane Roe]." (*Id.*).

In her closing statement, Jane Roe made the case that it was John Doe who had motiva-

tion to lie, not her:

> And with so much for [John Doe] to lose in this situation, it's foreseeable
> that he may not tell the truth. Again, I'm not reporting this rape because I want
> him – because I – there's any malicious intent. I just want him to know that what
> he did was wrong. There's no ulterior motive, *and this doesn't give me any benefit*
> *other than holding him responsible and meeting an ethical obligation –or respon-*
> *sibility, rather.*

(*Id.* at 299:25–300:9) (emphasis added).

John Doe had retained an expert witness to testify on the issue of alcohol intoxication and

blackouts, but the hearing coordinator, Matthew Page, would not permit Doe to call the witness.

While Doe's expert was not permitted to testify at the hearing, Doe did discuss the expert's cre-

dentials and his opinion in Doe's closing statement. The expert was Dr. Albert Staubus, a profes-

sor of pharmacology at OSU who works as a consultant in legal cases involving alcohol. (*Id.* at

304:18–20). Dr. Staubus's opinion was based on Jane Roe's statement of her alcohol consump-

tion, including how much she drank, of what, and when. His opinion also took into account Jane

Roe's height and weight. The Court presumes that the hearing board ignored John Doe's com-

ments about Dr. Staubus's opinion, since the hearing coordinator did not permit Dr. Staubus to

testify at the hearing, did not permit Doe to introduce his report, and no mention was made of it

in the board members' affidavits.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "In making this determination, 'the court must view the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor.'" *U.S. S.E.C.*

*v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). Essentially, the question here is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### III. Discussion

At issue in this motion is whether Defendants are entitled to qualified immunity on Doe's procedural due process claim that he was denied the right to effectively cross-examine Jane Roe at the disciplinary hearing.

#### A. Cross-Examination

To Doe's section 1983 claim for money damages, Defendants assert the defense of qualified immunity. "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). So while "[s]ection 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law," *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 478 (6th Cir. 2014), qualified immunity shields Defendants from liability unless they "violated a clearly established constitutional right," *id.* at 485. The first step in this analysis is to determine whether Defendants violated Doe's constitutional right; the second step is to determine whether that constitutional right was clearly established. The Court can determine the order of decision-making in the qualified-immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

Here, the Court analyzes whether Defendants violated Doe's constitutional right to procedural due process when they didn't permit Doe effective cross-examination of Jane Roe on her motive for disclosing the sexual assault when she did. Doe argues that is a genuine dispute of material fact. Specifically, Doe argues that Jane Roe made two misrepresentations that the OSU administrators knew were false and let stand unrebutted. One: that Jane Roe's decision to report the sexual assault came after OSU's decision to let her stay in school. Two: that she did not receive any benefit from her decision to report the alleged sexual assault. There's a third issue that implicates Doe's due process rights. Near the end of John Doe's testimony, one of the board members asked John Doe the following question: "[T]here seems to be no motivation for Jane

10

Roe to make this up. Why do you think she claims she doesn't remember what happened?" (269:10–13). John Doe replied, "I can't speak for [Jane Roe]." (*Id.* at 269:25–270:1).

Defendants argue several points: (1) Jane Roe didn't lie in the hearing because she didn't decide to "report" the sexual assault until after she knew that the medical school would permit her to stay in school, and (2) the hearing board understood that Doe was arguing that Jane Roe fabricated the sexual-assault allegation in order to stay in school, so Doe's ability to present his case to the disciplinary board wasn't inhibited.

Jane Roe's testimony before the disciplinary board was essentially that she had no reason to lie because the ABRC had decided to let her remain in medical school before her decision to report the assault. Is that true?

The ABRC was under the impression that Roe had already decided to formally report the sexual assault when she appeared at the hearing *before* it had decided whether to let her stay in school. In large part because of the sexual assault allegation, the ABRC permitted Roe to re-enroll and take a third shot at her first year of medical school. The ABRC informed Roe of its decision on April 20, 2015. Roe claims that she only formally reported the assault to Jeff Majarian on April 30, 2015. But she was merely carrying out actions she had already committed herself to doing in the ABRC hearing. (*See* ABRC Meeting Minutes, PageIDs 1580–82).

The minutes of the ABRC hearing reflect that Roe intended to, as part of her plan to continue her education, formally report the sexual assault to the university student conduct board. (PageID 1581). Roe's advocate at the ABRC hearing, Natalie Spiert, explained the reporting process to the ABRC, noting that it would impose a time requirement of 15–25 hours on Jane Roe. (*Id.*). Moreover, in a letter of support written by Kellie Brennan, OSU's Title IX Coordinator, Brennan said that "[Jane Roe] is currently working with my office to report a sexual assault that occurred in July 2014 by a fellow medical student at OSU." (PageID 1606). The ABRC Meeting Minutes state: "[Jane Roe] plans to officially report the incident in the near future." (PageID 1581). Before the ABRC had decided to let Jane Roe re-enroll, she told them that she planned to formally report the sexual assault.

Jane Roe represented to the ABRC that she was already in the process of formally reporting the sexual assault. Therefore, a reasonable jury could find that her testimony to the disciplinary board, that the ABRC's decision to permit her to re-enroll was already decided before Roe's "decision to report the assault," was not truthful.

Why does this matter? Critical to this case was a credibility determination: would the disciplinary hearing board believe Jane Roe or John Doe? Jane Roe claims she was too drunk to remember anything after midnight. John Doe claims she appeared relatively sober, able to carry on conversation, walk about ten minutes to his car, and consent to and actively participate in sex, even discussing safe sex and the need to keep their encounter discrete. Other witnesses who testified at the disciplinary hearing were equivocal on the topic of her intoxication; some said she was, others said she wasn't, others weren't sure. The issue of her intoxication is a critical one to this case because the disciplinary board found that Jane Roe was too intoxicated to consent to sexual activity, so John Doe violated OSU's sexual misconduct policy by engaging in sexual activity with her. Other than conflicting third-party testimony, the proof of her intoxication comes down to who you believe: John Doe, or Jane Roe. One might ask: what reason would Jane Roe have for making this up?

The hearing board thought this was a worthwhile question. One of its members asked it: "[T]here seems to be no motivation for Jane Roe to make this up. Why do you think she claims she doesn't remember what happened?" (Disciplinary Hrg. Trans. at 269:10–13). John Doe replied, "I can't speak for [Jane Roe]." (*Id.* at 269:25–270:1). Jane Roe did have a motive to claim she was too drunk to remember the encounter: she was threatened with expulsion from medical school and might be able to remain in school if she claimed to be the victim of a sexual assault.

An OSU administrator present at the disciplinary hearing could have answered the question though. Natalie Spiert attended the hearing as Jane Roe's advisor. She knew (1) when the medical school informed Jane Roe that she might be dismissed from the medical school, and (2) when Roe first told someone about the sexual assault, and (3) that Jane Roe had received a significant benefit from reporting the alleged rape, to wit the opportunity to repeat the first year of medical school for the third time. John Doe on the other hand knew none of this and had no way to answer the hearing board's question without merely speculating. Without this credibility-impeachment evidence, John Doe could only say, "I can't speak for [Jane Roe]." (*Id.*).

Defendants offer two main arguments to address these facts.

First, Defendants argue that the hearing committee's decision didn't hinge on a he-said-she-said credibility determination, but it was based, in part, on "non-party witness testimony." (*See, e.g.*, Aff. of Charles Smith at ¶ 10, Doc. 115-4). And unless this is the case, the Due Pro-

cess Clause does not require cross-examination at all. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005).

Defendants provide affidavits from each hearing board member, and all state that they "understood from John Doe's questioning of Jane Roe that he was suggesting to the panel that Jane Roe may have fabricated her allegations of sexual misconduct against him so she could stay in school." (*See, e.g.*, Aff. of Charles Smith at ¶ 5).[1] But this after-the-fact statement is belied by the statement of one of the board members at the hearing. One board member said, "There seems to be no motivation for [Jane Roe] to make this up. Why do you think she claims she doesn't re-member what happened?" (Disciplinary Hrg. Trans. at 269:10–13). The after-the-fact affidavit doesn't cure the problem evident at the hearing: Jane Roe appeared to have no possible motive to lie.

The Due Process Clause requires a fair procedure. What is "fair" depends on the circum-stances of each case. Thus, due process "is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation." *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988); *accord Flaim*, 418 F.3d at 634. Each particular situation may demand different procedural protections. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). In the Sixth Circuit, higher education disciplinary decisions implicate the Due Process Clause. *Flaim*, 418 F.3d at 633. Framing this inquiry are three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural require-ment would entail.

*Mathews*, 424 U.S. at 335. And when a case "is a disciplinary expulsion, rather than an academic one, we conduct a more searching inquiry." *Flaim*, 418 F.3d at 634.

The Court's "more searching inquiry" leads to the conclusion that this particular situation may demand that OSU provide John Doe with specific credibility impeachment evidence as a procedural protection as part of his right to cross-examination. But reaching this legal conclusion will require a jury to decide a dispute of material fact.

The private interest affected by OSU's action is John Doe's interest in continuing his ed-ucation, which as a fourth-year medical student set to graduate and applying for residencies, was

---

[1] The Court will reserve decision on the issue of the admissibility of this testimony if offered at trial.

substantial. Being expelled from OSU will have (and has had) significant professional and financial impacts on John Doe. He had to enroll in an off-shore medical school to finish his degree, and he is no longer eligible for federal student loans. If he is able to secure a career in medicine in the United States, he will very likely be worse off than if he had his MBA/MD from OSU. He is unable to secure a residency in his home state because of the off-shore school where he was finishing his degree. (PI Hrg. Trans. at 12:7–14). The discipline from OSU will remain on his educational record. In short, the private interest affected here is substantial.

Without the opportunity to cross-examine Jane Roe on her motive to lie, the risk of erroneously disciplining Doe was high. Cross-examination is one of the best fact-finding tools to "flush out the whole truth." *United States v. Radford*, 14 F. App'x 370, 376 (6th Cir. 2001). Here, the board had to weigh the competing credibility of Jane Roe and John Doe, and the board specifically asked, why would Jane Roe lie? That shows that the value of this critical impeachment evidence was high. The importance of Jane Roe telling the truth in the context of the university's obligation to provide Doe with a fair hearing was highlighted by her own advocate, OSU's Natalie Spiert, who said that if she thought Jane Roe had said something untrue at the disciplinary hearing, she "would have requested a break and consulted with legal counsel." (PI Hrg. Trans. at 255:9–13). Here, both the risk of erroneous deprivation and the probable value of the additional safeguard are high.

Finally: the government's interest at stake. Here, it wouldn't have required a significant fiscal or administrative burden to provide Doe with this information before the hearing or provide it to him during the hearing, or provide it to the hearing panel when one of them asked for it. This factor doesn't weigh heavily in Defendants' favor.

The Due Process Clause is flexible; it calls for such procedural protections as each particular situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In the context of student disciplinary hearings, "cross-examination is 'essential to due process,' . . . in a case that turns on 'a choice between believing an accuser and an accused.'" (Op. & Order at 18, Doc. 82 (quoting *Flaim*, 418 F.3d at 641 (dicta)). Here, John Doe couldn't effectively cross-examine Jane Roe on a critical issue: her credibility, and specifically, her motive to lie. This particular situation may indeed demand the procedural protection of the university either correcting a false statement or providing the accused with the necessary information to impeach a critical witness.

Sexual assault is a deplorable act of violence. Accusing someone of such an act is no small matter. "If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself . . . ." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016). Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

A reasonable jury could find that Jane Roe lied when she said the academic committee had already decided to permit her to repeat the first year of medical school for the third time and that she had nothing to gain by reporting the assault and no motive to lie. A reasonable jury could find that Natalie Spiert knew or should have known that Jane Roe lied or misled the disciplinary board. Notwithstanding the affidavits of the hearing board members, the board might have reached a different conclusion on Jane Roe's credibility if it had been presented with all the facts.

The Court can determine the order of decisionmaking in the qualified-immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). The Court elects to pursue the first step in the qualified-immunity analysis, which is determining what the relevant facts are. Here, that is determining what Spiert knew or should have known. If a jury finds that Spiert knew or should have known Roe lied at the disciplinary hearing, then the Court must decide as a matter of law whether her failure to disclose deprived Doe of his right to cross examination. *See Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (permitting question of fact to go to a jury before court decides legal question of whether qualified immunity applies).

The motion for summary judgment is denied as to Natalie Spiert because there is a genuine issue of material fact.

As to the other individual defendants, the Court will grant the motion for summary judgment on the issue of qualified immunity regarding the cross-examination issue.

Matthew Page heard Jane Roe's testimony at the hearing, but he wasn't privy to the timing of her earlier report of the sexual assault, nor was he privy to her statements before the ABRC. As the disciplinary hearing coordinator, Page had "the ability to ask a question to clarify" testimony that he believed to be untruthful. (Page Dep. at 79:23–80:9, Doc. 114-3). He didn't do that in this case because he was not aware that the "reason she was permitted to remain in

medical school was because she claimed to be the victim of sexual assault." (*Id.* at 80:14–20). He didn't know the timeline. (*Id.* at 81:22–82:1). There's no dispute of material fact about Page's knowledge; therefore, as a matter of law, he did not violate John Doe's due process rights. Page is entitled to qualified immunity on this claim.

John Doe admits that Brennan and Adams-Gaston were not at the disciplinary hearing and didn't hear Jane Roe's statements to the disciplinary board. But, Doe argues that it's a reasonable inference that Brennan and Adams-Gaston knew about the timing of Jane Roe's academic accommodation, the timing of her report of the sexual assault to the ABRC, and her statements to the disciplinary board because they were in a supervisory role. Doe says that "[a]s a matter of law, personal knowledge sufficient to create an issue of fact may be inferred to one in a responsible, supervisory position, where that person is required to be familiar with the practices of those he supervises."

While a supervisor may indeed be familiar with the *practices* of those she supervises, that doesn't mean that a supervisor knows the specific details of her subordinates' activities. Here, the due process inquiry is a fact-intensive one that requires showing that an individual knew the timing of Jane Roe's academic accommodation, the timing of her report of the sexual assault to the ABRC, and her statements to the disciplinary board. It's undisputed that neither Adams-Gaston nor Brennan knew all of Jane Roe's testimony to the disciplinary board. These specific facts weren't akin to the "implementation of a program," where a court might impute knowledge to a supervisor. *See Tucker v. Dickey*, 613 F. Supp. 1124, 1131 (W.D. Wis. 1985). Nor were all the necessary facts within the "sphere of responsibility" of either Adams-Gaston or Brennan such that the Court could reasonably infer knowledge of these specific facts to Brennan and Adams-Gaston. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). Therefore, both are entitled to qualified immunity.

### B. Reconsideration of Expert-Witness Issue

The Court earlier ruled that "there is no due process right to expert testimony in student disciplinary hearings, let alone is such a right clearly established." (Op. & Order at 15). On that basis, the Court held that Defendants were entitled to qualified immunity on Doe's claim that the Due Process Clause guarantees the right to expert testimony. (*Id.*). In light of a thorough review of the record of this case, the Court sua sponte reconsiders this earlier ruling and vacates it.

16

John Doe hired an expert to provide an opinion on whether or not "Jane Roe was likely to be intoxicated and/or substantially impaired when she engaged in sexual conduct with John Doe." (Ward Aff. at ¶ 11, Doc. 2-2). The hearing board coordinator, Matt Page, denied John Doe the opportunity to present either the expert's report or live testimony because OSU's procedural rules only permit fact and character witnesses, not opinion or expert witnesses. (Page Aff. at ¶ 11; *see also* Compl. at 45 (OSU Code of Student Conduct § 3335-23-10, Hearing Procedures)).[2]

If John Doe's expert witness, Dr. Alfred E. Staubus, were permitted to present his report and testify before the board, he would have testified that Jane Roe was likely capable of consenting to sexual activity, that she likely did not suffer a "blackout" of memory, but even if she did, she would have been capable of consent during the "blackout" period.

John Doe's expert, Dr. Alfred E. Staubus, stated in his report that it was his

opinion, to a reasonable degree of medical and scientific certainty that based upon [Jane Roe's] calculated blood-alcohol concentrations and the supporting eyewitness observations, [Jane Roe] was not alcohol impaired to the point where she was incapable of consenting to sexual intercourse and sexual contact at the time of the incident, or that she was incapable of saying 'no' to [John Doe] if she did not want to have sexual intercourse or sexual contact with him. Further, it is more likely than not that she was aware of her choices and decisions that night.

(PageIDs 1527–28).

Dr. Staubus would have testified about Jane Roe's alleged blackout too. For example, Dr. Staubus had this to say in his initial report:

[Jane Roe's] statements that in contrast to her previous drinking experiences of having partial memory losses (fragmentary blackouts) of events and activities during the drinking periods, on the night of July 12/13, 2014, she experienced for the first time a complete memory loss (an *en bloc* blackout) starting when she left Callahan's Columbus. As noted by Dr. Aaron White (see enclosed references), a blackout can occur when a person is consuming a large amount of alcohol over a short period of time, resulting in a rapid rise in blood-alcohol concentration. In such events, there is disruption in the transfer of short-term memory to long-term memory. The short-term memory during a blackout allows the individual to carry on conversations, perform tasks, and engage in (and even initiate) sexual activity. The disruption of the transfer of short-term memory to long-term memory prevents the individual from recalling the events and activities that occurred during the period of blackout. Based upon her reported subsequent interactions and text messages with [John Doe], it is questionable if [Jane Roe] actually did experience a blackout. However, even if she did experience a blackout, that does not mean

---

[2] The Code of Student Conduct does, however, permit the board coordinator to "appoint individuals with appropriate expertise to serve as consultants to the board. The consultants may be present and provide information as called upon during the hearing but will not vote." (*Id.*). Page did not appoint an expert consultant in this case.

she was alcohol impaired to the point of being incapacitated or unable to resist sexual advances. Impairment to the point of exhibiting apathy, general inertia, inability to stand or walk correspond to the Stupor stage of Alcohol Influence (0.27 to 0.40 g/dL)–blood-alcohol levels much greater than the amount of alcohol [Jane Roe] consumed. When the Gaswerks closed at 2:00 a.m., she was able to talk the 10-minute distance to [John Doe's] parked car. With or without a blackout condition, [Jane Roe] would have the ability to say "no" to [John Doe] if she had wanted to say that.

(PageIDs 1532–33).

The Court originally applied the *Mathews* test and determined that it "tilts away from requiring" live expert testimony at student disciplinary hearings. (Op. & Order at 15). The Court here reexamines the *Mathews* test. *See Mathews*, 424 U.S. at 335.

First, the private interest affected by OSU's action is substantial, as the Court has already addressed.

Second, the value of allowing live expert-witness testimony here is also substantial. Dr. Staubus's opinion went right to the heart of the case: whether Jane Roe was to be believed and whether she was too intoxicated to consent. Alcohol metabolism and the extent of impairment of human judgment and memory are not matters within the knowledge of lay persons. And the disciplinary board held Doe responsible for sexual misconduct because it found Jane Roe was significantly impaired by alcohol and could not consent. The risk of an erroneous result here was substantial given the key evidence Dr. Staubus would have provided.

Finally, the government's countervailing interest in not providing the additional procedure could be substantial. Permitting expert testimony at student disciplinary hearings would pose some fiscal and administrative burden on the university: it may have to retain experts, review reports, or prepare some form of cross-examination of an accused student's expert witness. But OSU's own rules already permit the hearing coordinator to call an expert akin to a special master; OSU calls them consultants, and the board coordinator may appoint them in "cases requiring special expertise." (*See* PageID 45). OSU's own rules contemplate part of the administrative and fiscal burden imposed by appointing an expert, and OSU's rules permit it because certain cases may require special expertise.

Here, it may be the case that due process required OSU to permit Doe's expert to testify. Doe's interest at stake is substantial. The university's countervailing interest is substantial too. But having an expert provide insight in these hearings is already a procedure within OSU's rules, so permitting an outside expert to testify is no great departure from its current procedure. In

short, it's plausible that OSU violated Doe's right to due process by failing to permit Doe's expert to testify and present his report.

The Court therefore reconsiders its earlier ruling and vacates its dismissal of this claim. The reconsidered ruling was on a motion to dismiss, and the parties have not conducted discovery on this issue. If they wish to conduct discovery, they may, and they may submit dispositive motions on this issue upon the completion of said discovery. The Court will reexamine the issue of whether a constitutional violation occurred and whether Defendants are entitled to qualified immunity. Discovery on the expert-witness issue should include all of the elements of the *Mathews* test.

## IV. Conclusion

Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. (Doc. 116).

The Court **GRANTS** summary judgment to individual defendants Adams-Gaston, Brennan, and Page on the cross-examination branch of Doe's due process claim. The Court **DENIES** summary judgment to individual defendant Spiert on the cross-examination branch of Doe's due process claim.

The Court sua sponte **RECONSIDERS** its earlier dismissal of Plaintiff's due process claim regarding the exclusion of his expert witness, and that claim is hereby reinstated.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: April 24, 2018